STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. LEE DANIELS, JR., DEFENDANT-RESPONDENT.

Argued May 14, 1962—Decided July 18, 1962.

243

Mr. *Brendan T. Byrne,* Essex County Prosecutor, argued
the cause for plaintiff-appellant (*Mr. Peter Murray,* Assist-
ant Prosecutor, of counsel and on the brief).

*Mr. Geoffrey Gaulkin* argued the cause for defendant-respondent.

The opinion of the court was delivered by

HALL, J.   On March 18, 1959 the defendant shot and killed his mother and wounded his sister in a small luncheonette operated by the mother on Waverly Avenue in Newark. He was indicted for murder and originally entered a plea of not guilty in the Essex .County Court.   Michael Breitkopf, Esq., a practitioner of long years of experience both as an assistant prosecutor and ' on the side of the defense in criminal matters, was assigned to represent him. On June 22, 1959 defendant changed his plea to *non vult, N. J. S.* 2A:113–3.   At the same time he entered similar pleas to indictments for atrocious assault and battery arising from the shooting of his sister and for armed robbery of a tavern and larceny of two automobiles.   The latter crimes were committed about 24 hours before the shooting episode. On July 10, 1959 he was sentenced to life imprisonment on the murder charge.   Sentences were also then imposed on the other charges, to run concurrently with the life sentence except that of 10 to 15 years for the robbery which was made consecutive thereto.

More than a year later Daniels filed a *pro se* application for *habeas corpus*.   Present counsel was assigned, who we may say has represented his client with great diligence and ability.   The application was then very properly molded into a motion in the original criminal cause to withdraw the *non vult plea* to the murder charge under *R. R.* 3:7–10(a). No attack was made on the pleas to the other indictments. The County Court (not the judge who accepted the pleas and imposed sentence) held a full hearing and concluded that the defendant should be permitted to withdraw the plea and stand trial.   The State has appealed under claim of right.   The matter comes to us directly because the indictment was for murder.   *R. R.* 1:2–1(c).

Defendant has raised a preliminary issue that the order is interlocutory and not appealable without leave. His motion to dismiss on that ground was held pending argument on the main case.

## I.

■ We will treat this procedural point first. The State's right to appeal in criminal cases is a limited one. The only rule dealing with interlocutory appeals is *R. R.* 1:2–4(c), effective September 11, 1961:

"In any criminal cause the plaintiff may appeal to the appropriate appellate court:
(1) from an interlocutory order entered before trial, *upon leave* granted by the appellate court   *   *   *
  *   *   *"   (Emphasis added.)

Defendant suggests that this appeal "would seem to be squarely within the intendment" of this rule since the order comes before a litigated trial in the case and permits the case to proceed to such a trial for the first time. We agree. Defendant presses his motion to dismiss, however, because the required leave of this court was not first obtained.

■ The State counters the motion by first urging that the matter should be treated as a *habeas corpus* proceeding, it having been originally instituted *pro se* in that form. In such event, the State has an absolute right of appeal where a discharge from custody is ordered because *habeas corpus* is not merely a further step in the criminal cause out of which it originates, but an independent civil proceeding with the order for discharge being the final judgment therein. *State v. Rivers*, 16 *N. J. Super.* 159 (*App. Div.* 1951). The difficulty with the argument is that *habeas corpus* does not properly lie in the instant situation since defendant did not seek, nor would he be entitled in any event to, a discharge from custody—an indispensable prerequisite to the writ in its traditional application. *In re Kershner*, 9 *N. J.*

471 (1952), *cert.* den. *Kershner v. State,* 344 *U. S.* 844, 73 *S. Ct.* 59, 97 *L. Ed.* 656 (1952).[1]

The State further points out that this court accepted and decided the State's appeal, without leave first obtained, in the somewhat similar case of *State v. Rosania,* 33 *N. J.* 267 (1960) and that the prosecution merely followed the procedural course seemingly approved there. That case, however, arose before the promulgation of *R. R.* 1:2–4(c); moreover, the question of appealability was not raised and we expressly passed over all adjective problems in order to decide a case of important public interest on the merits. 33 *N. J.,* at *p.* 273. Also *cf. State v. Levitt,* 36 *N. J.* 266 (1961).

▮ Alternatively the State asks us to treat its notice of appeal as an application for leave since it was filed within the 10-day period prescribed by *R. R.* 1:2–3 for motions for permission to appeal from an interlocutory order. We think we should accede to this request. *R. R.* 1:2–4(c)

---

[1] *Habeas corpus* has been very loosely used in this state in the last 15 years as a form of trial court proceeding for post-conviction applications involving constitutional or other collateral claims for relief not apparent on the record of the original conviction. Perhaps this has been occasioned by the absence of any fully prescribed procedure in our rules to present such claims and the federal requirement that some kind of procedure for that purpose must be afforded by the states. *Carter v. Illinois,* 329 *U. S.* 173, 67 *S. Ct.* 216, 91 *L. Ed.* 172 (1946). See *Janiec v. McCorkle,* 52 *N. J. Super.* 1, 17–18 (*App. Div.* 1958). Also, almost all of such applications are commenced by prisoners, acting *pro se,* who are unaware that most of such matters are properly undertaken by way of motion in the original criminal cause. In the vast majority of them *habeas corpus* technically does not lie, generally because a successful applicant would at most be entitled only to a trial or a new trial and not to a discharge from custody and freedom from further prosecution. Trial judges and even appellate courts have often tacitly molded the proceeding into a proper form but have still retained the *habeas corpus* title and frequently have continued to talk in terms of that writ. The result has been considerable confusion and a good deal of inappropriate language in our reported cases in such post-conviction matters, especially with respect to procedural aspects and consequences.

had just become effective and the prior practice had not been definitively stated. The case is an important one and we would have granted leave had it been applied for at the time. Defendant's motion to dismiss is therefore denied and we shall proceed to decide the matter on the merits.

## II.

Defendant's position on the merits before the County Court, and here, is best stated in the language of his brief:

"* * * defendant sought to establish two basic and inter-related facts. First, he sought to establish that his assigned counsel had not fully investigated his background, particularly his history of mental illness, and was therefore unable to counsel him adequately as to the availability of possible defenses or the wisdom of pleading *non vult*. Second, defendant sought to establish that he has colorable defenses to the crime charged, and that in justice and good conscience he should be permitted to put his case to a jury."

The scope of the first contention was perhaps somewhat expanded by defendant's testimony at the hearing that his counsel did not fully explain the alternatives and possibilities open to him even on the basis of the allegedly inadequate extent of the attorney's background knowledge. Daniels further testified that he did not understand that the plea of *non vult* would expose him to the possibility of a life sentence.

The County Court judge took quite a different tack in reaching his conclusion. He said:

"It is my determination that the impact upon the mind of the defendant by constant reference to the death penalty during his consultation with counsel, may well have placed him in such fear of death by execution that any other consideration as to the defense of the charges with which he was confronted were quickly cast aside by him * * *

*        *        *        *        *        *        *        *

Under the facts and circumstances leading up to and surrounding the plea in question, I am satisfied that *reasonable doubt* exists as to the free function of defendant Daniel's mind at the time he consented to plead *non vult*. In view of this, *I must resolve the doubt*

*in favor of defendant* and determine that he has suffered manifest injustice with the entry of the plea of *non vult* to the indictment in question." (Emhasis added.)

He further found that defendant possessed colorable defenses to the crime and that there would be no prejudice to the State in permitting a trial at this late date.

■ Where the withdrawal of a plea is sought *after sentence,* the criterion of *R. R.* 3:7–10(a) is that such action shall only be permitted "to correct manifest injustice." The burden of proof is definitely on the applicant and requires a "strict showing." This rule is dictated by the interest of finality of judicial procedures, especially in the light of all the safeguards required by our rules (*R. R.* 3:5–2; Criminal Procedure Form No. 13A) to protect against a guilty or *non vult* plea's being originally made other than truthfully, voluntarily and understandingly. *State v. Deutsch,* 34 *N. J.* 190, 198, 201 (1961); *State v. Fischer,* 38 *N. J.* 40 (1962). See also *State v. Wall,* 36 *N. J.* 216 (1961); *State v. Camp,* 35 *N. J.* 57 (1961), *cert.* denied 368 *U. S.* 881, 82 *S. Ct.* 131, 7 *L. Ed. 2d* 81 (1961); *Goodlet v. Goodman,* 34 *N. J.* 358, 372 (1961), *cert.* denied 368 *U. S.* 855, 82 *S. Ct.* 92, 7 *L. Ed. 2d* 52 (1961); *State v. Schrier,* 30 *N. J.* 241 (1959); *State v. Magonia,* 25 *N. J.* 95, 101 (1957); *State v. Gailes,* 64 *N. J. Super.* 232, 240–241 (*App. Div.* 1960); *State v. Torzillo,* 61 *N. J. Super.* 253 (*App. Div.* 1960); *State v. Nicastro,* 41 *N. J. Super.* 484 (*Cty. Ct.* 1956); *State v. Oats,* 32 *N. J. Super.* 435 (*App. Div.* 1954).

■ Applications to withdraw a plea are by their very nature within that class of matters addressed to the exercise of the court's discretion. *State v. Deutsch, supra.* By this is meant discretion founded on the facts and the applicable law and not simply an undisciplined whim. The concept has particular meaning in connection with the scope of review on appeal, for it is axiomatic that a trial court's conclusion in such situations will not be upset unless there has been a so-called "abuse" of discretion. Courts

use that term not in the sense of an invidious motivating influence, but rather in the connotation of a "mistaken" exercise—*i. e.,* "that the courts' ruling went far enough from the mark to become reversible error." *Hager v. Weber,* 7 *N. J.* 201, 213–214 (1951); *Smith v. Smith,* 17 *N. J. Super.* 128 (*App. Div.* 1951), *cert.* denied 9 *N. J.* 178 (1952). See *Fanwood v. Rocco,* 59 *N. J. Super.* 306, 315 (*App. Div.* 1960), affirmed 33 *N. J.* 404 (1960).

Here we think the County Court did stray too far from the mark, primarily because the wrong standard was used in appraising the proofs. It turned the application on a conclusion of "reasonable doubt" as to the free function of defendant's mind when he entered the *non vult* plea, resolved the doubt in his favor and so found the existence of "manifest injustice." As has been pointed out, this is not the criterion to be applied to the evidence where a change of plea is sought after sentence. The correct emphasis is opposite—a strict burden on the applicant to establish, by a fair preponderance of the proofs, not just a doubt but a solid affirmative basis dictating the exercise of judicial discretion in his favor.

■■ Application of the proper test to the proofs clearly leads to the conclusion that defendant has not sustained his burden. That result seems so plain that we feel called upon to exercise our original jurisdiction, thereby to determine the cause completely at this juncture. *R. R.* 1:5–4. Since the claim is built around an alleged lack of adequate investigation and advice by the assigned trial attorney, we should primarily look at the situation as it existed when defendant asked the trial court to accept a change of plea to *non vult.* This situation was thoroughly explored at the motion hearing through the testimony of defendant, the trial attorney, the sister who was wounded, a niece who was an eyewitness to the shooting, arresting and interrogating police officers, psychiatric reports, prior hospital records and other documentary evidence.

The shooting was as horrible as it was bizarre. Defendant,

a single man 25 years of age, had returned to his mother's house to live after release from the county penitentiary about two months previously. (He had an extensive criminal record, mostly for thievery.) Long-standing friction between the two redeveloped and he left home a few weeks later. About five days before the shooting, he was drinking in the luncheonette and a further quarrel ensued which resulted in his being painfully burned by hot liquid thrown at him by his mother. He said that he drank continuously from then until the fatal event of March 19 and that he was intoxicated when he returned to the store late that evening. The testimony of the eyewitnesses and the police officer who arrested him a few minutes after the shooting cast some doubt on the claimed alcoholic condition.

On the evening in question, defendant had on his person a fully loaded revolver which had been given him by one of his companions in the tavern holdup the preceding day and used in that crime. He claims he was disgusted with himself and life and had started to walk toward a railroad in the neighborhood to commit suicide, when some inner force directed him to the luncheonette. His mother, sister and niece were preparing to close the establishment for the night. He paid for a cup of coffee and played a record in the juke box. According to the eyewitnesses, he then turned the key in the front door, pulled out the gun and announced a holdup. He fired the pistol several times. The mother was killed instantly and the sister wounded. The witnesses said that he then took the money from the cash register and fled. According to Daniels' testimony at the hearing, he remembered nothing of what took place from the time he started to drink his coffee until he was arrested a few minutes later a couple of blocks from the store. However, in a statement given to the police the next day and in a letter written to Mr. Breitkopf from the county jail, he recalled that he took out the gun after his mother had berated him about his past conduct, and shot it three times, but made no mention of a holdup attempt. Be that as it may, there

was no doubt that a killing had occurred, that defendant had done the shooting and that the State had sufficient evidence to make out a *prima facie* case of felony murder, if not also a deliberate and premeditated killing.

Doubtless because of the uncommon circumstances, the prosecution procured a psychiatric examination within a few days. The county alienist reported a long history of family discord, poor home life, school and social adjustment and employment record, acute resentment against the mother, and overindulgence in alcohol. He also reported prior mental illness with confinement in a state hospital for several months about 10 years previously, as well as a medical discharge from army service by reason of a skin affliction for which government compensation of $100 per month was being received. He concluded that Daniels was somewhat mentally retarded, that there was no indication of present "acute psychotic reaction" although perhaps he was suffering from schizophrenia in remission, and that he knew the difference between right and wrong and was capable of consulting with his attorney in formulating his defense and standing trial.

After Mr. Breitkopf came into the case and began his investigation, he consulted with the defendant in jail and asked him to write a full statement of his life including complete details of the shooting and the events leading up to it. The defendant did this in a very well composed 12-page letter. (This document, as well as his testimony at the hearing, indicates a person of understanding and some native intelligence despite the psychiatrist's conclusion of low mentality.) The attorney talked with the county psychiatrist and was advised of his findings. He then secured court appointment of two eminent private psychiatrists who examined the defendant. Both reported, in effect, after fully reciting his life history, that he knew the nature and quality of his acts and the difference between right and wrong, that he was capable of cooperating with counsel in his defense, and that, while not committable, there was

psychopathology which should be considered in mitigation of full responsibility for the offense.   There was nothing in either report to indicate that the physicians could testify defendant was legally insane at the time of the crime so that an acquittal on the ground of insanity could reasonably be sought.   An experienced attorney like Mr. Breitkopf would realize, as he undoubtedly did, that the very best Daniels could hope for by trial, on this score, would be to hold the crime to second degree murder.   One has to conclude that, realistically, this was the only "colorable defense" defendant had, then or now; nothing was presented at the hearing on the motion intimating that Daniels now has available to him evidence with respect to his mental condition at the time of the shooting which is more favorable than what he had at the time he made his plea.

Looking at the other side of the coin with which Mr. Breitkopf was confronted in deciding how to advise his client, he learned from the Prosecutor the factual proofs available to the State and, most important of all, that the death penalty would be sought at trial.   (At oral argument the Prosecutor confirmed that this position would still be pressed.)   Counsel also might well have appreciated that the psychological or social reasons for the homicidal conduct would not have been sympathetically considered by a jury when offset by Daniels' prior record and the setting of the homicide itself.   So he did what every lawyer is obliged to do in such circumstances—lay the whole situation before his client in understandable terms, pointing out the alternatives and possibilities, and leave the final decision to the client.   Naturally he reported the State was seeking the death penalty—he would have been most remiss in his duty if he had not.   He told Daniels he thought he could secure acceptance of a *non vult* plea (permitting of a life sentence or that for second degree murder as the sentencing judge might decide) if that was what defendant wanted to do. We are thoroughly satisfied the decision was not forced upon him by his counsel.   We are convinced that Mr. Breitkopf

fully and properly performed his duty in investigating the case and advising his client within the requirements of *Goodlet v. Goodman, supra* (34 *N. J.,* at *pp.* 371-372). The County Court, although it erroneously granted the motion to withdraw, implicitly concluded to the same effect with respect to the conflicting testimony of Daniels and his attorney on this score.

Nor do we find any credible basis whatever to say that the plea was not understandably entered—a finding also implicit in the trial judge's conclusion. There is not any contention, as there was in *State v. Fischer, supra,* that defendant's state of mental competency was such as to preclude a valid choice and entry of plea. Rather the claim made by defendant at the hearing was that he did not understand he could be sentenced to life imprisonment and that his counsel had told him he would only be sent to the State Hospital for a couple of years. This is utterly unbelievable. Not only does the record show that the possible extent of punishment was called to his attention when he filled out Form 13A with his attorney and that the exact question put by the court at the time of the plea was answered affirmatively, but the contention is completely belied by another well composed letter he sent to Mr. Breitkopf after the plea and before sentence. He wrote, in the course of thanking the attorney for his services in saving his life, that he knew he must stay "in jail" for "I don't know how long."

Finally, we come to the County Court's basis of decision —doubt as to the free function of defendant's mind at the time of plea because fear of death by execution may well have brought about the too quick casting aside of consideration of possible defenses. There is no more fateful choice a man charged with a capital offense can make and it is the most elemental essence of human nature that he will choose a course to make death impossible regardless of other available alternatives which might or might not guarantee that result. And here the defendant knew the

State would seek the supreme penalty. We think it most unreasonable to say that because he chose certain life, that decision was an involuntary one subject to later avoidance. If such were the law it would seem no *non vult* plea to a murder indictment could ever stand where there had been any possibility of a death sentence. Defendant's position here is essentially no different from that which the appellant took in *State v. Wall, supra,* 36 *N. J.* 216. He has now simply changed his mind and has not sustained his burden of demonstrating that manifest injustice would result if he is not permitted to give his change of heart legal effect.

The order of the County Court is reversed and the matter remanded with directions to enter an order denying the motion to withdraw the plea.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.