81 N.J. Super. 296 (1963)
195 A.2d 485
STATE OF NEW JERSEY, APPELLANT,
v.
ERNEST P. TAYLOR, JAMES A. LEE AND JOSHUA PAUL MOORE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 1963.
Decided November 25, 1963.
*298 Before Judges CONFORD, FREUND and SULLIVAN.
Mr. John J. Barry, First Assistant Mercer County Prosecutor, argued the cause for appellant (Mr. Stanley E. Rutkowski, Mercer County Prosecutor, attorney).
Mr. Hugh D. Wise, Jr. (assigned counsel) argued the cause for respondent Joshua Paul Moore (Mr. Lowell F. Curran, Jr., of counsel and on the brief).
Mr. Gerald R. Stockman (assigned counsel) argued the cause for respondent James A. Lee.
*299 The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an appeal by the State, by leave of this court, from an order of the Mercer County Court dated October 8, 1962 suppressing evidence intended by the State for use in the trial of an indictment of the three defendants for carrying a concealed firearm in an automobile on the ground that it was discovered by an unconstitutional search of the automobile. The evidence consisted of the firearm in question.
A jury was impaneled for the trial of the case on September 18, 1962, and it was at once excused temporarily for what appears to have been a prearranged hearing of a motion by defendants to suppress the firearm as evidence because obtained by the authorities as the result of an unconstitutional search and seizure within principles binding the State enunciated in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). A hearing took place forthwith on proofs adduced by the State. Defendants offered to submit counter-proofs, but refrained when the court implied it was ready to rule in their favor on the basis that the State's own proofs demonstrated the illegality of the search. The court then made a formal ruling to that effect, holding the State had shown only "suspicious activity" by defendants prior to the search, not probable cause for a search of the car without a warrant, as here. After so ruling, the court recalled and discharged the jury.
The evidence adduced on the motion was as follows. One Miga, owner of a bar at Pine and Ohio Avenues, Trenton, went into the street from the bar at 1 A.M. on July 25, 1962 when he heard his dog bark. He testified:
"In the meantime when I looked I seen a car across the street with three men in it, * * * at the time it looked like a light chocolate car, it was real light. Then as I went in they just shot right by. That is all."
One Ozga, owner of a bar at New York and Mulberry Avenues, Trenton, testified that shortly after 1 A.M. on the same date,
*300 "three persons looked in through the screen door so I paid no mind to it. A few minutes later I seen it again, so I was curious. I walked out. I looked out toward New York Avenue. I didn't see nobody. So I went the opposite side of Mulberry. I looked up and I didn't see nothing, so I came back to the bar, I got a flash light and I went out the ladies' entrance on Mulberry Street. I looked in the cars and trucks. I even looked in the back yard. I didn't see nobody. I headed back again, and as I got out Mulberry Street they just happen to walk by me. When they seen me they walked fast. So at that time I took notice one had a glove, a yellow glove, * * *. Then as they got out further they started running, they run up as far as, past Ohio Avenue, turned into the alley toward Pine Street.
Q. As a result of that what did you do?
A. Well, when I seen the glove and all, I called up headquarters and explained to them. They asked me what happened. I gave them the details; so after that two officers came over and questioned me, asked me all questions. I told them the same thing.
Q. Did you give the description of these men to the officers?
A. Yes. The officers and headquarters."
On cross-examination Ozga was asked:
"Q. Did you make any complaint to the police officer about the commission of any crime specifically related to these young men?
A. No crime committed, nothing. All they did I thought was fishy was wearing the glove. That's the reason I called headquarters."
Trenton police officer Crerand testified as follows. He and an associate patrolman, Vandeleur, were detailed on the morning in question to the location of Ozga's bar. Ozga informed him "that a few minutes before our arrival he had heard a noise in the rear of his building. He went out with a friend and a flashlight and he saw three * * * youths running from the back of the building, run north on Mulberry Street toward Ohio Avenue, and they disappeared from view." In the description given the officers one of the "teenagers" was described as wearing a yellow glove on one hand. The officers began "checking the neighborhood" when they were stopped by Miga, who informed them that "about one o'clock that morning three * * * youths  Well, he heard his dog was barking and he came out to investigate and three * * * youths were in a tan car which he thought was a Pontiac, was parked across from his house. As he came out the car *301 pulled away from him and turned in front of him, down Ohio toward Mulberry." The officers "associated the first job with the second" and "put out an alert for that auto."
Crerand further testified that at 2:30 A.M. the car in which defendants were riding was stopped as a result of the alert by two other Trenton patrolmen and held by them for questioning by Crerand and Vandeleur at the request of the latter. Crerand saw a yellow glove which was visible through the window "on the back of the car inside." On interrogation, defendant Lee told Crerand it was his glove; that he had been in the vicinity of Mulberry and New York Avenues to use the bathroom; and that he used the yellow glove for sparring because he had a "bad wrist." The glove, which was offered in evidence, was left-handed. Defendants were ordered out of the car, Vandeleur went around to the right side of the car, and shortly reported to Crerand, "Hold them * * * here's a gun." The defendants were then searched personally, the car was searched thoroughly, and defendants were taken into custody. There is no evidence that the defendants were personally searched before the gun was found.
On cross-examination, asked as to his intention in asking defendants to leave the car, Crerand said: "We wanted to check them. We saw the glove. We wanted to check the men personally." Checking the car "wasn't particularly in my mind at that particular time." Neither of the bar owners mentioned seeing a gun to the officers, and Crerand admitted that he had no information which "even remotely pointed in the direction of the existence of a gun in that car."
Vandeleur testified that after Crerand asked the defendants to get out of the car and he came around to the passenger's side,
"I had the door open and as they were getting out I had my flashlight. I was observing their movement, procedure. I just seen an object down on the floor. I just reached down and I grabbed it and it was a gun so then I told my partner to hold everything right there, as I felt possibly they might have another weapon, similar type, on their person, so I retrieved the gun as they got out."
*302 On cross-examination, Vandeleur said:
"I was, when they were getting out I had the light on. I was just, I was observing, watching and I seen this here. I didn't know what it was laying on the floor. I just reached in.
Q. You didn't know what it was when you first saw it?
A. No, I didn't.
Q. You didn't know what it was until you reached in and had it in your hand?
A. Right.
Q. Can you tell the court what part of the gun was protruding and caught your eye sight?
A. I recall, I believe it was the barrel. I remember reaching in and grabbing the barrel.
Q. Now, can you tell the court precisely where in the vehicle the gun was found?
A. It was near the center, underneath the front seat, just as there's a hump that comes over the transmission. That is where the crank shaft runs under and it was over there. I couldn't say whether, which side it leaned more to, the driver's side or the passenger's side.
Q. It was quite close in the middle so far as you recall?
A. Yes.
Q. And tucked under the front seat of the car?
A. It wasn't tucked under. I mean, as I said, I didn't know what it was. It was just an object there and it was out enough that I noticed an object laying there and just out of curiosity's sake I just reached in there." (Emphasis added)
The motion for leave to appeal was heard by this court October 22, 1962. Before deciding it we remanded for the taking of additional testimony and the making of specific findings of fact and conclusions of law. We were particularly concerned with the absence of testimony by defendants on the original motion. The order of remand specified that defendants might interpose any other defenses and objections, including that of double jeopardy. (However, no such defense has yet been asserted formally by any defendant.)
At the hearing on the remand the defendants all testified, in substance or effect, that before Vandeleur came around to the passenger side of the car and found the gun he first addressed defendant Lee, who was sitting in the back seat, asked him why he was wearing a yellow glove, and after hearing his explanation, said he lied and struck him. He then got into the back, pulled the back seat up, searched the area *303 with his flashlight, and put the seat back. Thereafter he went around to the front end, required defendant Taylor to open the glove compartment, flashed his light in there, and finally got into the front of the car and flashed the light under the front seat, thereby finding the gun.
On rebuttal, Vandeleur denied he was "in the car" before he found the gun. He also markedly departed from his original testimony and said that when he first observed the object in the car he "thought it was some sort of a weapon * * * possibly a piece of pipe * * * to hit somebody over the head * * *." He couldn't tell it was a gun. It was "barely sticking out from underneath the front seat."
Patrolman Roche of the police car which first stopped defendants' car, testified that after questioning them he and his fellow patrolman were about to release defendants, since they had their addresses and Roche knew one of them "and felt we could get a hold of them if necessary," when the other police car came along and took over the investigation.
The trial judge made detailed findings of facts fairly covering the proofs as to the activities of defendants and the officers' knowledge thereof. After a finding that Vandeleur by flashlight "observed an object [in the car] just barely sticking out from underneath the middle of the front seat," he also found as follows:
"12. Until he [Vandeleur] removed the object from under the seat, he could not identify it.
13. He reached in the car, removed the object, and it proved to be a cocked, unloaded revolver.
14. When he did so the upper portion of his body was inside the car and his feet remained outside.
15. The Court finds as a matter of fact that the action of Officer Vandileur constituted a search and the finding of the gun was a product of such search. * * *
17. Prior to discovering the gun under the front seat of defendant's car, Officer Vandileur did not enter the back seat area of the automobile, pull up the back seat, search the said area with his flashlight and put the seat back.
18. Prior to said discovery, Officer Vandileur did not require the defendant, Ernest P. Taylor, to open the glove compartment of the car, nor did said Officer shine his flashlight therein."
*304 Among the conclusions of law by the judge was one that: "1. There was no probable cause for Officer Vandileur to search the motor vehicle in which the defendants were riding on July 25, 1962." There was no finding as to whether there had been an arrest before the finding of the gun.
After the filing of the supplemental transcript, findings and conclusions, and supplemental briefs pertaining thereto, we granted the State leave to appeal on February 28, 1963.

I.
Because of the position of our dissenting colleague in this appeal we point out that defendants have not at any time raised any question as to the jurisdiction of the court to entertain this appeal under the rules of court, or as to the propriety of our disposition of the appeal on the search and seizure issue rather than on grounds of double jeopardy. We invited the attention of the parties to the latter point after the argument, and defendants earnestly besought our disposing of the appeal at this time on the merits rather than on the ground of double jeopardy. We think we should honor that request. The search and seizure question has been thoroughly briefed and argued and is of public importance. The issue of double jeopardy has never been raised by defendants. It was required to have been raised before trial. R.R. 3:5-5(b)(2). Although we granted leave to interpose the defense in the order on remand, it has still not been raised by defendants, either below or here. Finally, the merits of that issue are not altogether free from doubt. See State v. Williams, 30 N.J. 105, 120-121 (1959), discussing situations wherein the law recognizes that "it would be unjust and opposed to the public interest to say that an abortive ending of the trial before verdict created a bar to further trial * * * because realistically there had been no exposure to conviction at all * * *." It may be noted, too, that a debatable argument could be made that defendants impliedly consented to the discharge of the jury on the ruling suppressing the evidence, having made the motion which directly led to that discharge. *305 Cf. State v. Locklear, 16 N.J. 232, 235 (1954); State v. Wolak, 33 N.J. 399, 401, 402 (1960). The question of double jeopardy in this specific context should await a case where it has been duly pleaded, adequately tried and argued at trial level and on appeal, and necessarily requires resolution.
As to the supposed matter of absence of authorization to have allowed the appeal, raised in the dissent, we note first that the point has never been made by defendants. R.R. 3:2A-10, which allows the State to apply for leave to appeal an order suppressing evidence apparently only "on a motion before trial," was adopted effective January 2, 1963, and thus does not control this case, the motion for leave to appeal having predated the rule. When the motion was made, R.R. 1:2-4(c)(1) (as amended July 27, 1961) was controlling. It is true that this appears to limit the State's right to apply for leave to appeal in criminal cases to interlocutory orders "entered before trial." It would seem that the draftsmen of the rule entertained the assumption that this limitation was necessary to avoid the problem of double jeopardy. However, as noted above, we are not going to decide the applicability of double jeopardy on this appeal. That being so, and regarding the matter therefore as one of procedure rather than constitutional right, it is our opinion that in the particular circumstances of this case we should entertain a relaxed construction of R.R. 1:2-4(c)(1) so as to save the State's right of appeal in the interests of justice. R.R. 1:27A. In the present case, as noted above, the intention of defendants to submit the motion to suppress the evidence before actually trying the case seems to have been concurred in by the State and to have been acquiesced in by the court. The mere impaneling of the jury, in that light, was a technicality not impairing the thesis that in substance if not in form the motion and order were made before trial, and therefore not justifying denial of the State's right to apply for leave to appeal the resulting order of suppression, as a matter of justice to both sides. Cf. State v. Daniels, 38 N.J. 242, 246-8 (1962). In any case, in view of our determination on the merits, defendants suffer no harm.
*306 We thus proceed to the merits of the search and seizure question.

II.
The State's first argument is that there was no search of the automobile. It contends that the officer merely picked up an object which was openly visible by means of his flashlight and "seemed to be a weapon." Were the premise valid the conclusion would also be. Moreover, acceptance of that premise would conclude the case in favor of the State, as there then would have been justification for the seizure of the gun as evidence of a crime being committed in the officers' presence. But we do not so find the facts.
We are not disposed to reject any of the findings of fact by the trial judge, credibility, demeanor and motivation of the witnesses being significant factors. We are accepting his finding that the officers did not, as testified by defendants, make an extended exploratory search throughout the car before finding the gun. By the same token, however, we also accept the court's finding that until Vandeleur removed the object from under the front seat he could not identify it. ("I didn't know what it was. * * * [j]ust out of curiosity's sake I just reached in there.") This was obviously based on the fully warranted conclusion that Vandeleur's testimony to that effect at the original hearing on the motion was the truth, rather than his later testimony on the remand that he thought the object was some sort of weapon. If there is any doubt from the trial judge's findings that it was his conclusion from the evidence that Vandeleur had no idea at all as to what the object was, and reached in for it solely out of curiosity, we herewith make our own finding of fact to that effect. The officer's credibility as to this matter on the original hearing was far more reliable, in our judgment, than at the hearing on the remand, for obvious reasons.
In this view of the facts, the officer's opening the door of the car, taken in combination with his bending over into the vehicle to remove the unidentifiable object under the seat, was *307 unquestionably a search and seizure. Such cases as State v. Smith, 37 N.J. 481 (1962), are not factually apposite.

III.
The State also contends, alternatively to the point just discussed, that the search of the vehicle was incident to the arrest of the defendants and that there was probable cause to search the car. These questions are interrelated.
As most recently reiterated in Henry v. United States, 361 U.S. 98, 100, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), and Ker v. California, 374 U.S. 23, 34, 46-47, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), see also State v. Doyle, 40 N.J. 320, 324 (1963), a search without a warrant is permissible only if incident to a lawful arrest; and an arrest without a warrant must itself be justified by probable cause to support an incidental search. We desire at the outset, however, to put to one side the question whether a lawful arrest (without a warrant) made practically simultaneously with an otherwise justifiable search (without a warrant) is rendered without efficacy to support the incidental search on the mere basis that it was made a very short time after the search or the commencement of the search, if realistically the arrest and search were a single transaction supported by probable cause. But see State v. Doyle, supra (40 N.J., at p. 325). See Annotation 89 A.L.R.2d 715, 734-6 (1963), discussing automobile-search cases impinging on this question. We do not here face that question and imply no opinion on it, for we conclude that (1) there was no probable cause for either an arrest or a search, and (2) there was neither arrest nor intention to arrest on the part of the police at any time for the crimes here asserted by the State to have been the basis of probable cause, and therefore there cannot have been a valid search incident to a lawful arrest. Either of these conclusions is determinative against the State's position. However, they are interrelated, and we discuss them together.
The State contends there was probable cause to arrest and *308 search on the basis of the crimes of attempted breaking and entering or attempted burglary or conspiracy to commit those crimes. See State v. Carbone, 10 N.J. 329, 341-2 (1952); State v. O'Leary, 31 N.J. Super. 411 (App. Div. 1954). We are well satisfied with the finding, clearly implied, by the judge who heard the motion, that there was inadequate foundation in the facts known to the officers at the time of the search "to warrant a man of reasonable caution in the belief" that these defendants had actually conspired to burglarize or break and enter, or had attempted to commit those crimes, within the definition thereof in the cases cited. See Jones v United States, 357 U.S. 493, 496-7, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); State v. Smith, supra (37 N.J., at p. 495). The stated requirement is to be "strictly enforced." Henry v. United States, supra (361 U.S., at p. 102, 80 S.Ct., at p. 171, 4 L.Ed.2d 134). The existence here of a basis for suspicion may be conceded; also that the evidence need not be such as to establish guilt. The critical line is that "between mere suspicion and probable cause," Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The Supreme Court in Henry v. United States, supra, quoted with approval a recent expression that "[a]rrest on mere suspicion collides violently with the basic human right of liberty." (361 U.S., at p. 101, 80 S.Ct., at p. 170, 4 L.Ed.2d 134). The right of freedom from search and seizure without a warrant on nothing more than suspicion is no less zealously safeguarded by the courts. See State v. Macri, 39 N.J. 250, 255-6 (1963). Moreover, the finding of unreasonableness of this search by the trial court is entitled to the full weight accorded any factual determination by a trial court. See Ker v. California, supra (374 U.S., at pp. 31-32, 83 S.Ct., at pp. 1628-1629, 10 L.Ed.2d 726).
Of substantial probative significance in this discussion is the fact that the police never arrested defendants for conspiracy or attempt to commit burglary or breaking and entering, even after finding the gun in the car. (Nor have they ever been prosecuted for such crimes.) The testimony of the *309 officers strongly indicates they never even entertained the thought of arresting defendants for conspiracy or attempted burglary or entering. Their purpose at all times involved was strictly investigatory. While not conclusive on the question of the existence (considered objectively, i.e., in the eyes of the "prudent man," Henry v. United States, supra (361 U.S., at p. 102, 80 S.Ct., at p. 171, 4 L.Ed.2d 134)) of probable cause grounded in those criminal offenses, the decision of the police not to arrest therefor at least supports the view that probable cause in respect of those offenses never existed here  certainly not before the gun was found. Cf. DePater v. United States, 34 F.2d 275, 276, 74 A.L.R. 1413 (4 Cir. 1929) "In passing upon the question of whether the search was legal or reasonable the court cannot escape drawing certain conclusions from the course pursued by the officers themselves."
The significance of absence of actual intent to arrest or search on the purported basis of probable cause of conspiracy or attempt goes beyond its probative effect in relation to the issue of existence of facts objectively justifying the thesis of probable cause. The controlling cases demonstrate that the making by the arresting and searching officers of a subjective judgment of the existence of probable cause in relation to the crime hypothesized is essential to a legal search without a warrant. Thus, in Brinegar v. United States, supra, the court said (338 U.S., at p. 176, 69 S.Ct., at p. 1311, 93 L.Ed. 1879):
"Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. * * * That line [between suspicion and probable cause] necessarily must be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances." (Emphasis added)
It is plain that the legality of the search without a warrant is predicated upon the officers themselves making the considered *310 "judgment" of the existence of probable cause as to the crime hypothesized, in the place of the judicial officer who makes that judgment from the proofs submitted to him where a search warrant is applied for, see State v. Macri, supra (39 N.J., at p. 257), the particular circumstances excusing the officers from obtaining the warrant in advance of the search. See also State v. Klein, 79 N.J. Super. 559, 566 (App. Div. 1963).
Illuminative by analogy in this regard is the unbroken line of cases to the effect that where the purpose of the officers is to search for evidence of crime and not to arrest the defendant on the basis of what is known before the search, a search without a warrant is unlawful, and the unlawfulness is not cured by the incriminating results of the search. Jones v. United States, supra (357 U.S., at p. 500, 78 S.Ct., at p. 1257, 2 L.Ed.2d 1514). See also Lee v. United States, 98 U.S. App. D.C. 97, 232 F.2d 354 (Cir. 1956); DePater v. United States, supra; United States v. Sully, 56 F. Supp. 942 (S.D.N.Y. 1944). The search must depend upon the arrest, rather than the arrest depend upon the product of the search. See State v. Smith, supra (37 N.J., at pp. 495-6).
Thus, in summary of this heading of this opinion: (1) there was no probable cause before the search to believe that defendants had committed the crimes of conspiracy or attempted breaking and entering or attempted burglary; (2) the officers never made a judgment before the search of probable cause of the commission of those crimes, and the search was thus not the result of any such judgment; (3) there never was an arrest or intention to arrest for those crimes; the only arrest was for carrying the concealed weapon; and (4) the search here was therefore not a search incidental to any arrest, lawful or otherwise, made on probable cause to believe that defendants had committed the first above-mentioned crimes.
The rulings of the United States Supreme Court cited above in support of the foregoing conclusions broadly bind us as encompassing the "fundamental criteria" of a constitutional *311 search and seizure without a warrant under the Fourth and Fourteenth Amendments. Ker v. California, supra (374 U.S., at pp. 33-34, 83 S.Ct., at pp. 1629-1630, 10 L.Ed.2d 726); and see State v. Smith, supra (37 N.J., at p. 492, 181 A.2d, at p. 766).

IV.
In arguing the existence of probable cause, the State stresses the fact that it was an automobile which was searched here, not realty premises, citing Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), Brinegar v. United States, supra, and decisions following them. It is sufficient for present purposes, without more, to note that the Carroll line of cases does not purport to eliminate the requirement of probable cause to believe a crime has been or is being committed, as a prerequisite for a valid search of an automobile without a warrant. In the case before us we have already approved the finding of absence of probable cause below. Nor do those cases, properly analyzed, eliminate the requirement of a lawful arrest to which the search is incidental, in relation to crimes of conspiracy or attempted breaking and entering or attempted burglary.
As recently as the 1959 case of Henry v. United States, supra, which involved the search of an automobile suspected of containing merchandise stolen from an interstate shipment in violation of federal law, the court reversed a conviction based upon evidence procured by that search when it found there was no probable cause for the arrest of the defendants and the search of the vehicle. The court cited the Carroll case in the course of its opinion without any suggestion that the basic law of search and seizure is altered by the mere fact that the object of the search is an automobile. It said (361 U.S., at p. 104, 80 S.Ct., at p. 172, 4 L.Ed.2d 134):
"The fact that the suspects were in an automobile is not enough. Carroll v. United States (U.S.), supra, liberalized the rule governing searches when a moving vehicle is involved. But that decision merely *312 relaxed the requirements for a warrant on grounds of practicality. It did not dispense with the need for probable cause." (Emphasis added)
In accord: Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960).
See also the comprehensive discussion of the problem of searches of automobiles in State v. Valentin, 74 N.J. Super. 502 (Law Div. 1962), where, as here, a search of a car disclosing a gun was involved. Absence of probable cause to justify a search of a vehicle was also found by this court recently in State v. Klein, supra.
It has been noted that in Carroll the court was concerned with efforts of federal law enforcement agents not merely to punish offenders against the National Prohibition Act, there involved, but also to enforce provisions of that act pursuant to which illegal transportation of liquor subjected the liquor and the vehicle to seizure and confiscation. United States v. DiRe, 332 U.S. 581, 584-586, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Thus, the Carroll opinion can justifiably be read as having sustained the search there involved as reasonable because expressly authorized by an act of Congress presumptively valid under the Eighteenth Amendment, without implying any sweeping abrasion of previous constitutional concepts of search and seizure in the case of automobiles as distinguished from fixed premises, or in relation to the requisite foundation of a lawful arrest for a valid incidental search without a warrant in cases not concerned with seizure of contraband or the like. See State v. Klein, supra (79 N.J. Super., at pp. 567-8). Cf. State v. Scharfstein, 79 N.J. Super. 236, 240 (App. Div. 1963). This view is fortified by the opinion in Henry v. United States, supra, read as a whole, as well as the holding in Rios v. United States, supra.

V.
The distinction between the right and duty of law-enforcement authorities to investigate in suspicious circumstances, *313 and the constitutional immunity of the citizen from search of his automobile unless there is probable cause to arrest is clearly drawn in State v. Valentin, supra (74 N.J. Super., at pp. 506-7).
The stated distinction has been instructively elaborated in an opinion by Judge Kaufman in United States v. Bonanno, 180 F. Supp. 71 (S.D.N.Y. 1960) (sustaining the admissibility of evidential information secured by police investigation in the immediate aftermath of the so-called Apalachin "crime convention"). The right of law-enforcement personnel to stop and question, whether found on foot or in automobiles, persons found in circumstances suggestive of the possibility of violation of criminal law, was there thoroughly considered and affirmed. (180 F. Supp., at pp. 77-81.) We are in full accord. ("* * * [I]t is the duty of a policeman to investigate * * *." State v. Smith, supra (37 N.J., at p. 496).) But the police investigative activity pursued in Bonanno was expressly distinguished by the court from a search and seizure of property; the statements there procured, from property or physical objects which might be yielded by a search and seizure; and the background circumstances there presented, from such as would give rise to probable cause justifying an arrest with the consequent right of incidental search and seizure without a warrant (180 F. Supp., at pp. 83-84). Although the conviction in Bonanno was reversed, sub. nom. United States v. Bufalino, 285 F.2d 408 (2 Cir. 1960), the above cited opinion of the trial court in respect of admissibility of the statements given during detention was expressly noted as not passed on. (Id., 285 F.2d, at p. 413, n. 6.) As to the right of detention and interrogation, generally, see also State v. Smith, 32 N.J. 501, 534-5 (1960).
Of course, when proper detention and interrogation of suspicious occupants of a car lead to direct perception without a search of incriminating objects within the car, which, either alone, or together with other information had by the officers, constitutes probable cause, a search of the vehicle without a warrant is proper. See Henry v. United States, supra, dissenting *314 opinion (361 U.S., at pp. 104-5, 80 S.Ct., at p. 172, 4 L.Ed.2d 134). Cf. Rios v. United States, supra. But the present is not such a case under the proofs and the trial court findings of fact we have approved. The bona fide intent of these officers to prevent the commission of a crime by these defendants, if, as may be, that was their purpose, cannot itself justify a search without a warrant not otherwise supportable within the controlling decisions of the courts as to the meaning and effect of the Fourth and Fourteenth Amendments. We do not understand the State here to contend otherwise.
Assigned counsel in this case have discharged their duties in commendable fashion.
Judgment affirmed.
SULLIVAN, J.A.D. (dissenting).
I question the correctness of the trial court's ruling. However, I think the appeal should be dismissed on the ground that the order of the Mercer County Court was not appealable by the State and this court is without jurisdiction to review it.
The motion to suppress the evidence was made after a jury had been impaneled and sworn to try defendants. Prior to hearing the motion, the trial judge stated that if he granted the motion "the case is over." He did grant defendants' motion, recalled the jury and discharged it.
The aforesaid ruling is not appealable for two reasons which are interrelated.
In a criminal case, the right of the State to appeal is governed by R.R. 1:2-4(c). (We are not here concerned with R.R. 3:2A adopted subsequent to the ruling herein.) So far as is here pertinent, the rule provides that the State may appeal to the appropriate appellate court "from an interlocutory order entered before trial, upon leave granted by the appellate court * * *." (Emphasis added) Manifestly this limitation on the State's right to appeal is because of the constitutional provision against double jeopardy. It is perfectly clear to me that the order in question was entered at *315 trial and not before trial. The State therefore had no right of appeal and this court had no power to grant leave to appeal.
The other reason why the ruling is not appealable is that such appeal violates the constitutional mandate against double jeopardy. Subject to certain exceptions not here pertinent, the general rule is that when a person has been subjected to a valid indictment, has been arraigned thereon and pleaded thereto, and has been put to trial before a court of competent jurisdiction and a jury has been impaneled and sworn, he is in jeopardy. State v. Williams, 30 N.J. 105, 120 (1959). It is not necessary that an actual judgment of acquittal be entered, since discharge of the jury without the accused's consent (save in a situation covered by one of the exceptions heretofore mentioned), is tantamount to an acquittal. State v. Locklear, 16 N.J. 232, 235 (1954).
Counsel for defendants would have us decide the vexing question of search and seizure herein, reserving the right to set up the defense of double jeopardy if perchance the State should prevail on this appeal, or attempt to retry defendants. I do not agree. The appeal itself is jeopardy. See State v. Cannarozzi, 77 N.J. Super. 236 (App. Div. 1962). I would dismiss the appeal.