THE STATE OF NEW JERSEY, COMPLAINANT-RESPONDENT, IN THE INTEREST OF JOSE ANGEL CARLO, JUVENILE-APPELLANT.

THE STATE OF NEW JERSEY, COMPLAINANT-RESPONDENT, IN THE INTEREST OF THOMAS STASILOWICZ, JUVENILE-APPELLANT.

Argued September 26, 1966 — Decided November 21, 1966.

226

*Mr. Maurice M. Krivit* argued the cause for the juvenile-appellant, Jose Angel Carlo (*Messrs. Krivit & Krivit*, attorneys; *Mr. Spencer N. Miller* on the brief).

*Mr. Eugene P. Kenny* argued the cause for the juvenile-appellant, Thomas Stasilowicz.

228

*Mr. Alvin S. Michaelson,* Assistant Prosecutor, argued the cause for the complainant-respondent (*Mr. James A. Tumully, Jr.,* Prosecutor of Hudson County, attorney).

The opinion of the court was delivered by

PROCTOR, J. Juvenile delinquency complaints in the Hudson County Juvenile Court charged that the appellants, Thomas Stasilowicz age 15 and Jose Angel Carlo age 13,[1] caused the death of Deborah Coleman age 10 on June 30, 1964, by committing an attack upon her. The matters were consolidated, and extensive hearings were held at which the State was represented by the County Prosecutor, appellants were represented by counsel, and a stenographic transcript was made. *R. R.* 6:9–1(b). The court found that the appellants were juvenile delinquents "in that they have committed acts which had they been committed by persons of the age of eighteen years or over would constitute Second Degree Murder * * *." Thomas was committed to the State Reformatory at Annandale for an indeterminate period of time, and Jose was committed to the State Home for Boys for an indeterminate period of time. They appealed to the Appellate Division, and we certified the proceedings to this Court on our own motion.

Deborah Coleman lived with her parents at 587 Grove Street, Jersey City. On Monday, June 29, 1964, she was not at home when her mother returned from work shortly before midnight. A preliminary search for the missing girl was unavailing, and first report of the disappearance was given to the Jersey City police in the early hours of Tuesday, June 30. Neighbors and friends assisted in the search. On Thursday, July 2, at about 2:20 P. M. Deborah's body was found by the police near her home under an old door in the cellar of the tenement house at 182 Pavonia Avenue, Jersey City. A subsequent autopsy showed that the death was caused by strangulation.

---

[1] The complaint against Jose erroneously gives his age as 14.

Later that same afternoon appellants, along with other neighborhood boys who knew Deborah, were taken to the police station for questioning. In the course of separate interrogations each appellant made oral and written confessions. At the trial both appellants denied any complicity in the killing. They testified that their confessions were the product of fear and fatigue caused by extensive grillings by the police. The juvenile court judge determined that the confessions were voluntary and admissible. The primary issue on these appeals is whether or not these confessions were properly admissible.

Thomas Stasilowicz, age 15 and in the fifth grade of school, lived with his parents in the four-family tenement house with a grocery on the first floor at 182 Pavonia Avenue, in the cellar of which Deborah was found strangled. One of the several woodsheds in the cellar, some 20–25 feet from where Deborah was found, was used for storage by Thomas's parents, and he had access to it. There was evidence which tended to show that the homicide was committed in this woodshed.

The State's witnesses testified that Thomas was taken from his home at about 4:00 P. M. on Thursday, July 2, and driven to the Second Precinct by Detective Mullins. He was informed he was a "prime suspect" and was questioned for about 45 minutes by Detectives Mullins and Burgess. He was then asked to take a lie detector test and he agreed. Thomas's parents, who had come to the precinct station house, signed an authorization for this test.

Thomas was then taken to the main police headquarters and arrived there at 5:30 P. M. At 5:40 he was in the lie detector room with Sergeant Rogers who conducts such tests. After informing Thomas of the operation of the test and his right to remain silent and his right to retain counsel, Sergeant Rogers administered the test for about an hour. After the test was completed Rogers continued to question Thomas. As a result of this further interrogation at 8:30 or later Thomas made an oral admission, and at about 10:30 he made a handwritten confession of guilt. At some time prior to the

written statement Rogers informed Thomas that Jose was
being questioned at the Second Precinct and had made cer-
tain admissions which differed from those made by Thomas.
(Thomas testified that he was told Jose was "hanging him.")

Thomas was then taken back to the Second Precinct by
Detective Mullins and arrived there at 11:00 P. M. He was
brought up to the detectives' room where Jose was being ques-
tioned so that the boys might identify each other. He was
then taken downstairs to a back room and for the first time
since he was in custody given some food. He was then ques-
tioned until 12:45 A. M., at which time Detective Mullins
began to type out his questions and Thomas's answers on a
police form. (Thomas testified that he was handcuffed to a
chair during this period of questioning.) The typewritten
statement was not finished until shortly after 2:00 A. M.
Thereafter Thomas was taken to the Hudson County Youth
House in Secaucus.

The typewritten statement contains printed language cau-
tioning the proposed maker of the statement that he need not
answer the questions, that answers given should be "volun-
tary" and that the answers will be used at trial. After pre-
liminary questions for purposes of identification of the maker
the statement sets forth the charge as follows:

"* * * you did in the City of Jersey City the County of Hudson
aforesaid and within the jurisdiction of this court, did willfully
feloniously, and of malice aforethought, kill and murder said Deborah
Coleman contrary to the provisions of N. J. statutes 2A:113-1 and
N. J. Statute 2A:113-2 and against the peace of this State, the gov-
ernment and dignity of the same."

There is no indication in the statement or from the testimony
at the trial that the language of this charge was explained to
Thomas. The substance of the confession states that Thomas
and Jose together killed Deborah on Tuesday afternoon, June
30, in the cellar of 182 Pavonia Avenue.

There are substantial contradictions between Thomas's two
statements: in the first the killing happens early Monday eve-

ning (roughly 5:30 P. M.), Thomas acts alone, and no sexual attack is mentioned; in the second Deborah is locked in the shed at 5:30 P. M. Monday and the killing does not take place until 1:30 P. M. on Tuesday, Jose is present at the killing on Tuesday, and Thomas says he raped her three times. Further, uncontroverted circumstantial and testimonial evidence tends to contradict certain elements in each statement. The second statement says that Deborah was raped, but the autopsy showed that the hymen was intact, that there was no evidence of trauma to the vagina, but that there was some "congestion" which might have been caused by a physical contact; the State conceded that a slide test for spermatozoa was negative. Both statements say Thomas struck Deborah on the face, but the autopsy showed no evidence of trauma or cuts on the face or bleeding other than that caused by the strangulation.

In the first statement Deborah is said to have been killed about 5:30 P. M., and in the second statement Deborah is said to have been locked up alive in the shed from 5:30 P. M. Monday to 1:30 P. M. on Tuesday. However, Mrs. Carol Gajdzisz, a neighbor, testified she saw Deborah playing on Monday, June 29, at 6:00 P. M. and later at 8:00 P. M. Mrs. Mary Ann McMahon, another neighbor, saw Deborah playing on Pavonia Avenue with her own children from about 7:45 to 8:55 P. M. on that same Monday evening. The shed was made of wood slats with openings at the top which readily allowed the passage of sound. But another friend of the family, Mrs. Witkowski, while helping to search for Deborah, entered the cellar at 182 Pavonia Avenue at 5:00 A. M. on Tuesday, June 30, turned on the light and called out to see if Deborah was there, and received no response. Finally, Deborah's mother was sitting outside at 184 Pavonia Avenue, next door to the cellar, from 5:00 to 8:00 A. M. on that Tuesday and heard and saw nothing.

The police testified that during their questioning they asked Thomas if he wished to see his parents, but that he replied in the negative; further, that his family did not ask to see him when they first came to the Second Precinct station house.

This evidence was disputed. However, there is no dispute that Thomas's father with other family members returned to the station house four more times that evening, at approximately 7:30, 9:30, 12:00, and 1:00 A. M., asking to see him. These requests were always denied with the response that the boy was still being questioned.

Jose Angel Carlo age 13 was born in Puerto Rico and came to the United States when he was seven years old. He lived with his parents at 169 Pavonia Avenue, Jersey City.

The police testified that Jose was picked up around 5:00 P. M. on Thursday, July 2, and taken to the Second Precinct for questioning. He was questioned by Detective Mackesy beginning around 6:30. Then, beginning about 7:30, he was turned over to Detective Jackson because he was "reluctant" to talk to Mackesy. Detectives Mackesy and Lavecchia remained present. Jackson told Jose that any statement would have to be "voluntary" but did not explain what this word meant or tell Jose of his right to remain silent. After obtaining an oral admission sometime around 10:00 o'clock, Jackson left the room to report to his superiors.

Detective Mackesy testified that Jackson returned in about 15 minutes and Jose was given some food. Then Mackesy, in the presence of Detectives Jackson and Lavecchia and Sergeant Farino, began to type out questions and Jose's answers on a police form which recites that it was begun at 10:35 P. M. The taking of this statement lasted until about midnight. Jose was not taken to the Hudson County Youth House until 2:55 A. M.

The same police form was used for Jose's statement as for the typewritten statement of Thomas, and it contained the same printed cautionary language and the same legal terminology of the charge. Detective Mackesy, who typed this statement, on cross-examination testified that he explained what the cautionary printed language and the legal terminology in the charge meant; but none of this explanation appears in the statement.

The substance of Jose's confession states that Thomas and he saw Deborah playing in the hallway of 182 Pavonia Avenue at 11:30 A. M. on Tuesday, June 30, with a little boy who lived in the building; took her and locked her in the shed; and returned at 1:30 that afternoon at which time Thomas raped, then killed her.

Uncontroverted circumstantial and testimonial evidence tends to contradict certain elements in Jose's statement. It says that Thomas raped the girl causing her to bleed, and that Thomas said he liked the feel of her blood flowing on him. However, as noted above, the autopsy showed that such a sexual assault could not have occurred. Jose's statement also says that Thomas struck the girl in the face with his fist three times, causing her to bleed and fall; but as noted above the autopsy showed no evidence of trauma to the face. The statement says Deborah was playing in the hall at 11:30 A. M. on Tuesday, but she had been reported missing the previous evening and a search by her parents, neighbors and police had been unavailing.

The police testified that during their questioning they asked Jose if he wished to see his parents, but that he replied in the negative. Jose disputes this. However, it is undisputed that Jose's father, accompanied by various family members and friends, came to the station house five times that evening, at 6:30, 7:00, 8:00, 11:00 and 2:00 A. M., and asked to see his son. On each occasion this request was denied with the response that the boy was still being questioned, and that the father could not see his son until the questioning was completed.

Each appellant when he was first taken into custody and later at the trial maintained his innocence. Each contends that his oral and written confessions were the product of police coercion and that therefore their admission into evidence violated the due process clause of the Fourteenth Amendment.

██ It is well settled that at a criminal trial, before the confession of an accused can be received in evidence against

him, the State must carry the burden of establishing that the defendant's will was not overborne and that the confession was "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut,* 367 *U. S.* 568, 602, 81 *S. Ct.* 1860, 1879, 6 *L. Ed. 2d* 1037, 1057 (1961) ; *State v. Cook,* 47 *N. J.* 402, 415 (1966). Where a confession has been admitted into evidence, our review of the record must be "wide and penetrating" to make sure that the fundamental fairness requirement of due process is met. *State v. Smith,* 32 *N. J.* 501, 544 (1960) ; *State v. Cook, supra,* 47 *N. J.,* at *p.* 416.

The State contends as to each appellant that the constitutional requirements applicable to ordinary criminal trials do not govern proceedings in the juvenile court, and that: "Guidelines set forth governing the admission of inculpatory statements into evidence in a Criminal Court are not relevant to proceedings in the Juvenile Court." In support of this proposition the State directs our attention to the admittedly different objectives and procedures of juvenile as distinguished from criminal courts. A juvenile under 16 is deemed incapable of committing a crime. *N. J. S.* 2A:85–4. The juvenile court is vested with exclusive jurisdiction to hear complaints against persons under the age of 16 charging them with acts which, if committed by a person over the age of 18, would constitute a crime. *N. J. S.* 2A:4–14 and 2A:4–15. Juvenile proceedings are not criminal cases. *Ex parte New-kosky,* 94 *N. J. L.* 314 (*Sup. Ct.* 1920). The statutory scheme is designed to permit the State to exercise its powers as *parens patriae,* for the purpose of rehabilitating instead of punishing youthful offenders. *State v. Monahan,* 15 *N. J.* 34, 38 (1954). See Handler, "The Juvenile Court and the Adversary System," 1965 *Wis. L. Rev.* 7.

A juvenile against whom complaint has been brought and tried in juvenile court has been held not entitled to "the direct application of the clauses of the Constitution which in terms apply to criminal cases." *Pee v. United States,* 107 *U. S. App. D. C.* 47, 274 *F. 2d* 556, 559 (*D. C. Cir.* 1959).

For example, a juvenile is not entitled to grand jury indictment or trial by jury. *Ex parte Newkosky, supra,* 94 *N. J. L.,* at *pp.* 316–317; see *N. J. S.* 2A:4–35. See remarks of Justice Fortas speaking for the Court in *Kent v. United States,* 383 *U. S.* 541, 86 *S. Ct.* 1045, 16 *L. Ed. 2d* 84, 94 (1966), to the effect that cases have held that a juvenile is not entitled to bail, indictment by grand jury, speedy and public trial, trial by jury, confrontation of accusers, and immunity against self-incrimination.[2]

 But insofar as the State suggests that the constitutional safeguard of voluntariness governing the use of confessions does not apply in proceedings before the juvenile court, we must emphatically disagree. Involuntary confes-

---

[2] In *Kent* Justice Fortas indicated a concern that a child in the juvenile court "receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." 383 *U. S.* 556, 86 *S. Ct.,* at 1054, 16 *L. Ed. 2d,* at *p.* 94. Judge Robert Gardner of the Superior Court of California, commenting on *Kent,* suggested that when a juvenile is accused of an act which would be a crime if committed by an adult he should be afforded basic constitutional rights including bail and trial by jury:

"Since the juvenile court was established as a civil court under a guardianship philosophy, basic constitutional rights were abandoned. Yet when the jurisdiction of the court is invoked in a case involving a criminal offense, this presents, in the language of retired Justice Thomas A. White of the California Supreme Court (then sitting on the bench of the District Court of Appeal), 'a legal fiction presenting a challenge to credulity and doing violence to reason.' *In re Contreras,* 109 *Cal. App. 2d* 787, 241 *P. 2d* 631 (1952).

\* \* \* \* \* \* \* \*

When the jurisdiction of a court is being invoked for a criminal offense, basic constitutional rights should be available to all—adults or juveniles. When the charge is the commission of a crime, rights should be identical, be the accused 16 or 60.

On this point, there is an interesting historical footnote in the great debates on the Fugitive Slave Law. One of the main criticisms of that Law was not slavery per se, the existence of which the Constitution recognized, but the fact that under it the alleged fugitive Negro was denied the right to bail and to a jury trial. Are our children entitled to less? Was the Constitution written only for adults?" Gardner, "The *Kent* Case and the Juvenile Court: A Challenge to Lawyers," 52 *A. B. A. J.* 923, 924 (1966).

sions are likely to be untrue. *McCormick, Evidence* § 109, 227–228 (1954); *McGuire, Evidence of Guilt*, § 3.03, 109 (1959). Assuming a juvenile is not entitled to all the constitutional requirements of a criminal trial, we firmly believe he is at least entitled to a fact-finding process which measures up to the essentials of due process and fair treatment. *Kent v. United States, supra*, 383 *U. S.*, at *pp.* 560–563, 86 *S. Ct.*, at *pp.* 1056–1058, 16 *L. Ed. 2d*, at *pp.* 97–98; *Harling v. United States*, 111 *U. S. App. D. C.* 174, 295 *F. 2d* 161, 163 (*D. C. Cir.* 1961); *Pee v. United States, supra*, 274 *F. 2d*, at *p.* 559; *cf. Slate v. Tuddles*, 38 *N. J.* 565, 573 (1962). Use of an involuntary confession in a juvenile court proceeding offends fundamental fairness because of the likelihood of its untrustworthiness. See *United States v. Morales*, 233 *F. Supp.* 160, 170 (*D. C. Mont.* 1964); *In re Rutane*, 37 *Misc. 2d* 234, 234 *N. Y. S. 2d* 777, 780 (*Family Ct.* 1962). See also Comment, "Criminal Offenders in the Juvenile Court," 114 *U. Pa. L. Rev.* 1171, 1181–1184 (1966); Alexander, "Constitutional Rights in the Juvenile Court" in *Justice for the Child*, 88 (*Rosenheim ed.* 1962).

■ Moreover, our court rules provide that juveniles under the age of 16 accused of committing a homicide, as here, are tried in a proceeding which has all of the appurtenances of a criminal trial. Under *R. R.* 6 :9–1 (b) the county prosecutor presents the State's case, the juvenile must be provided with counsel, a stenographic record must be made of all hearings, and the prosecutor and counsel for the juvenile present evidence and cross-examine witnesses. In most other juvenile proceedings the prosecutor is not allowed to appear, *R. R.* 6 :3–5, the juvenile is merely "entitled" to counsel, *R. R.* 6 :9–1 (a), a stenographic record is made only on request of a party, *R. R.* 6 :2–10 (a), and the judge examines the witnesses, *R. R.* 6 :9–1 (c). The Legislature has provided that a juvenile adjudicated delinquent because of an act of homicide should be confined for an indeterminate period until he is deemed fit for parole by the appropriate paroling authority. The confinement, however, need not end when he reaches the

age of 21 (as is so for all other delinquents) but may extend until his period of confinement reaches the maximum sentence which could have been imposed on an adult who committed such a homicide, here found to be second degree murder. *N. J. S.* 2A:4–37(b) (2). Appellants could therefore be confined for up to 30 years. *N. J. S.* 2A:113–4. We think that such special hearing procedures and lengthened possible confinement for juveniles accused of an act of homicide necessarily entail that normal evidentiary rules of criminal trials apply.

This leads us to the question of whether in the present case the confessions of each appellant were obtained by methods inconsistent with that due process of law which the Fourteenth Amendment commands. The leading case having to do with a confession by a young suspect is *Haley v. State of Ohio,* 332 *U. S.* 596, 68 *S. Ct.* 302, 92 *L. Ed.* 224 (1948), where a 15-year-old boy was convicted of murder. Five days after the alleged crime he had been taken from his home at midnight to police headquarters, and questioned until 5:00 A. M. when he confessed. This confession was admitted in evidence at the trial. The United States Supreme Court, in reversing the conviction on the ground that the confession was obtained in violation of due process, said:

"What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child — an easy victim of the law — is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 A. M. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned him hour after hour, from

midnight until dawn. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning.

\* \* \* \* \* \* \* \*

The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law." 332 *U. S.*, at *pp.* 599–601. 68 *S. Ct.*, at *pp.* 303–304, 92 *L. Ed.*, at *pp.* 228–229.

We think that the circumstances under which the confessions of Thomas and Jose were obtained are quite similar to those described in *Haley v. State of Ohio, supra.* We are not satisfied that the State has borne its burden of proving that these confessions were voluntarily made and that the fundamental fairness requirement of due process has been met. In reaching this conclusion as to each appellant, we have not weighed the credibility of witnesses, but have based our determination on evidence which either was produced by the State or was uncontroverted.

■ Appellant Thomas was taken from his home into custody around 4:00 P. M., and questioned successively by at least two police officers at two different police stations during the six and one-half hours before his handwritten confession was made. The further questioning which ended with a typewritten confession did not conclude until about 2:00 o'clock the next morning, some ten hours after custody began. This protracted period of interrogation of a 15-year-old boy casts serious doubt that the statements he made were voluntary and truthful.

■ Appellant Jose was taken into custody from his home at about 5:00 P. M., and was questioned successively by at least two police officers frequently in the presence of two more police officers during the five-hour period until his oral admission was made and during the seven hours it took until a written confession was concluded around midnight. Such

extensive quizzing of a 13-year-old boy strongly suggests that his inculpatory statements were not voluntary and are not trustworthy.

■ Both boys were taken to the Second Precinct station house for interrogation. The Legislature has mandated that no child under the age of 16 shall "at any time" be placed in a police station. *N. J. S.* 2A:4–33.[3] In *State v. Smith, supra,* this Court determined that this statute was not applicable to juveniles (both 17 years of age) who were taken to a police station for the temporary purpose of questioning. 32 *N. J.,* at *p.* 532. However, we infer from these provisions as to detention that the Legislature has recognized that putting a juvenile under the age of 16 in a police station is likely to have harmful effects on the mind and will of the boy. See *In re Rutane, supra,* 234 *N. Y. S. 2d,* at *p.* 778, where a like statute was said to have as a purpose the protection of the child from "the frightening atmosphere of a station house." See also *N. J. S.* 2A:4–32[4] for its special provisions

---

[3] The full statute reads as follows:

"No child under the age of 16 years coming within the provisions of this chapter shall at any time be placed in any prison, jail, lockup, or police station.

A child between the ages of 16 and 18 years coming within the provisions of this chapter shall not be placed in any prison, jail, lockup or police station unless there shall be no other safe and suitable place for his detention, and it is necessary for his protection or the protection of the public, and unless when so placed in a jail, lockup or police station it shall be in a segregated section of such premises where the said child cannot have contact with any adult convicted of crime or under arrest.

Nothing in this section shall be construed as forbidding any peace officer from immediately taking into custody any child who is found violating any law or ordinance or whose conduct or surroundings are such as to endanger his welfare.

When a child shall have been taken into custody, he may be transported to his home, or to the place of detention or other place designated by the juvenile and domestic relations court, in a radio patrol car, or other vehicle not specifically intended for the transportation of adults under arrest."

[4] The pertinent part of *N. J. S.* 2A:4–32 reads as follows:

"Whenever any officer takes a child under 16 years of age into custody, he shall, unless it is deemed impracticable or has been other-

as to custody of juveniles under age 16 and compare these with the less restrictive custody provisions (*R. R.* 6:8–3) for juveniles age 16 or 17 as discussed in *State v. Smith, supra* 32 *N. J.,* at *pp.* 528–529. The likelihood of such harmful effects upon the minds of these boys, both under 16, of being placed and interrogated in the threatening atmosphere of an isolated room in a police station must be weighed in our determination of the voluntariness of their confessions.

The evidence is uncontroverted that the parents of both boys made repeated efforts to see their sons when the boys were being interrogated. With the possible exception of the first visit by Thomas's parents where the evidence is disputed, these attempts were always rebuffed with the response that the parents could not see the boys until the questioning was completed. Indeed, the parents were not able to see their sons until the next morning when the boys were brought from the Youth House to the juvenile court. These denials evidence to us an approach by the police which rode roughshod over the parent-child relationship in order to obtain confessions by intimidation.

The police denied the parents of these boys the opportunity to see them when the boys were being grilled about a most horrible crime and were in the greatest need of a friend. Boys age 15 and 13 quizzed in a police station alone and without support can easily become victims "first of fear, then of panic." *Haley v. State of Ohio, supra.* Recognized juvenile authorities are in accord that parents or guardians should be present when juveniles are being questioned concerning their participation in acts of delinquency:

---

wise ordered by the juvenile and domestic relations court, accept the written promise of the parent, guardian or custodian to be responsible for the presence of such child in said court at the time fixed. Thereupon the child may be released in the custody of the parent, guardian or custodian, or in the custody of a probation officer or other person designated by the court. If not so released, the child shall be taken immediately to the place of detention designated by the court and the officer taking him shall immediately notify the court and shall file a petition or preliminary notice pursuant to the practice in the court.

"Whenever possible and especially in the case of young children, no child should be interviewed except in the presence of his parents or guardian. This should always be the policy when a child is being questioned about his participation or when a formal statement concerning the child's participation in the alleged delinquent act is being taken." *Standards for Specialized Courts Dealing with Children* (Children's Bureau, Department of Health, Education and Welfare, 1954), at *p.* 39. This publication was prepared by the Children's Bureau in cooperation with the National Probation and Parole Association and the National Council of Juvenile Court Judges and cited with approval in *Harling v. United States, supra,* 295 *F.* 2d, at *p.* 163, n. 12.

The refusal by the police in the present case to permit the parents access to their sons during the interrogations might well be sufficient in itself to show that the confessions were involuntary even though, as the police testified, the boys did not wish to see their parents. Boys of 13 and 15 lack the judgment to appreciate the seriousness of the situation and the harm which they may do themselves by yielding to the pressures of insistent police questioning. See *Gallegos v. State of Colorado,* 370 *U. S.* 49, 54, 82 *S. Ct.* 1209, 1212, 8 *L. Ed.* 2d 325, 328 (1962), where the confession of a 14-year-old boy was held to be involuntary:

"The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights."

 The State contends that both boys were advised of the constitutional rights which would be due to one accused of a crime before they made their statements and that, knowing of these rights, the boys nevertheless confessed. However, it seems doubtful that these boys, age 15 and 13, had the mental capacity, particularly in the environment of a police station, to appreciate the extent of their rights and

the consequences of a failure to exercise them. The language of *Haley v. State of Ohio, supra,* is particularly apt:

"But we are told that this boy was advised of his constitutional rights before he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain." 332 *U. S.,* at *p.* 601, 68 *S. Ct.,* at *p.* 304, 92 *L. Ed.,* at *p.* 229.

We do not think that these admonitions by the police should be given significant weight in our determination of voluntariness.

The method used here by which the formal statements were taken, that is, a police officer typed out his questions and the suspect's answers, is a far from satisfactory way of recording statements. For example, without a stenographic transcript by a qualified reporter we cannot properly evaluate the effectiveness of the explanation not contained in the statement itself which Detective Mackesy stated he gave Jose of the printed cautionary language. As Justice Hall, speaking for this Court, said in *State v. Smith, supra,* in 1960 about this method of taking statements:

"* * * The result is, of course, not *verbatim* quotation of the subject and the final language is that of the typist. We may say that this is not a desirable method of taking a confession. The person's own words are most important and such can best be assured by a fairly conducted question and answer interrogation taken down stenographically and then transcribed by a qualified reporter. * * *" 32 *N. J.,* at *pp.* 554–555.

See also *State v. Cook,* 47 *N. J.* 402, 418 (1966).

Upon a consideration of the totality of the circumstances under which the appellants' confessions were obtained, we cannot say it convincingly appears that the confessions

were voluntarily made. In the light of the combination of (1) the inconsistencies among the several statements of appellants in themselves and the inconsistencies between each statement and the uncontroverted circumstantial and testimonial evidence, (2) the age of the appellants, (3) the protracted periods of persistent questioning which preceded the confessions, (4) the oppressive environment of the police station where the questioning was conducted, and particularly (5) the repeated refusal by the police to let the parents see their sons we cannot find that the State has met its burden of proving that the oral and written confessions of each appellant were obtained by methods consistent with due process and which vouch for their trustworthiness. We therefore hold that these confessions were improperly introduced into evidence and the trial court's determination that the boys were delinquents must be reversed.

In the view we have taken of the case it is unnecessary to consider each appellant's contention that an arrest occurred, that the arrest was illegal, and that the confessions of each boy were inadmissible as products of an illegal arrest. See *State v. Jackson,* 43 *N. J.* 148 (1964), and see *State v. Traub,* 151 *Conn.* 246, 196 *A. 2d* 755 (*Sup. Ct. Err.* 1963), *cert.* denied 377 *U. S.* 960, 84 *S. Ct.* 1637, 12 *L. Ed. 2d* 503 (1964). It is also unnecessary to decide appellant Jose's further contention that his extra-judicial confession, even if voluntary, was not sufficiently corroborated to sustain a finding of juvenile delinquency. See *State v. Lucas,* 30 *N. J.* 37 (1959), and *cf. Robinson v. State,* 204 *S. W. 2d* 981 (*Ct. Civ. App. Texas* 1947).

The judgments of the juvenile court are reversed as to both appellants.

WEINTRAUB, C. J. (concurring). I join in the opinion of Mr. Justice Proctor.

I have no difficulty with the case at hand, but since it is evident that courts are about to re-examine the whole spectrum of the juvenile process in constitutional terms, I think

it appropriate to comment, in broad terms, upon that troublesome subject.

Under our statute the approach to juvenile delinquency is wholly rehabilitative except with respect to heinous offenses committed by a juvenile age 16 or 17, as to which the juvenile court, if it finds another objective is demanded in the public interest, may refer the juvenile to the criminal courts.

Few of man's institutions reach the heights meant for them. This, of course, is no reason to tear down what we have. That the juvenile process may fall short of its ideal would not justify returning the infant to the throes of the criminal process. Nor does that circumstance suggest that we apply wholesale to the juvenile process the constitutional rights of one suspected or charged with crime, for we cannot deal with juvenile delinquency as if it were a crime without giving it precisely that character.

The object of the juvenile process is to make men out of errant boys. In that process we must build upon the truth. A juvenile should be led to believe the decent thing is to come clean, to face the music. A father, inquiring as to possible misconduct of his son, would feel a bit absurd if he told the son the truth may be used against him, that he has a right not to answer, and that he may consult counsel before deciding whether to talk. That scene would be absurd for a couple of reasons, and one is that that is no way to teach integrity. No parent would deal that way with his child, and I would hope that government need not deal that way with him when it claims the parental role as it does in the juvenile process.

This of course does not take the juvenile process beyond all constitutional protection. A child can be rehabilitated only in the face of the truth, and that process would be undue which harbors the danger of falsity. If a confession is obtained in circumstances which cast doubt upon its truthfulness, it has no place in the juvenile process. Hence I agree that due process of law would be offended by the use of a confession which is "involuntary" in the sense of that word as it

once was understood with respect to confessions of adults, that is, a confession obtained by means which cast doubt upon its reliability. Thus, there should be every assurance that the juvenile was not led into a false account, and to that end, at least if the offense is a serious wrong, the police should see that a parent or some relative or friend is present, if it is at all feasible, to allay the fear or pressure a youngster could feel in strange hands and a strange setting. And of course a parent cannot be excluded because the infant wants it that way; the decision is the parent's and not the child's. But an infant need not be warned that the truth will be used against him, for the very assumption of the juvenile process is that the truth will be used to help him. Rather he should be impressed with the fact that a false admission would be as wrong as a false denial. And because of the ease with which some boys may yield to suggestion, I would insist upon a *quantum* of corroboration we do not now demand with respect to confessions of adults. This is especially true where the wrong is such that rehabilitation could not be achieved without confinement.

I would add a word with respect to the appropriateness of the principle, evolved with respect to crime, calling for the suppression of the truth in order to deter official misbehavior.

If the State would rehabilitate a youngster, its officers of course should set the good example. The police should not use tactics which are palpably wrong. I do not refer, however, to the rules of the drawing room or the playing field. The State cannot be that immaculate if it is to cope with the dirty business of lawlessness, and even offenders, juvenile and adult, would not expect it to be. Rather I refer to conduct intolerable to one who is sensible to the demands of effective law enforcement.

With respect to crime, we suppress the truth even if it means the release of one who is plainly guilty, and this in the belief that the support thereby given a constitutional value outweighs the price tomorrow's victims may pay. I would suggest that it need not follow that the same course should be

pursued with respect to juvenile delinquency, since as to it there is still another value to be weighed, to wit, the rehabilitation of the infant. To deny an infant the attention he needs because the police erred in obtaining evidence of that need may not be the parental thing to do.

HALL, J., concurs in result.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For affirmance* — None.