95 N.J. Super. 307 (1967)
230 A.2d 907
STATE OF NEW JERSEY, PLAINTIFF,
v.
ALAN LOWRY AND BENJAMIN FERGUSON, DEFENDANTS. STATE OF NEW JERSEY, COMPLAINANT, IN THE INTEREST OF B, JUVENILE.
Superior Court of New Jersey, Law Division (Criminal).
Decided May 9, 1967.
*311 Mr. Elmer J. Herrmann, Jr., Assistant Prosecutor, for the State (Mr. Brendan T. Byrne, Essex County Prosecutor).
Mr. Peter S. Valentine for Alan Lowry (Messrs. Glickman & Valentine, attorneys).
Mr. Charles B. Helfgott for Benjamin Ferguson.
Mr. Elliot M. Baumgart for Juvenile B (Newark Lawyer Project).
SCHAPIRA, J.C.C. (temporarily assigned).
Alan Lowry and Benjamin Ferguson, adults, and B, a juvenile aged 17, move to suppress evidence, R.R. 3:2A-6, seized as the result *312 of an allegedly illegal search of a parked car in which they were seated.
Defendants Lowry and Ferguson are charged with unlawful possession of a narcotic drug, to wit, marijuana, N.J.S.A. 24:18-4. Juvenile B is charged with an offense under the Juvenile Delinquency Act, N.J.S. 2A:4-14(1)(a) in the Essex County Juvenile Court, the disposition of which is awaiting the outcome of this motion.
All defendants urge the court to suppress the evidence  marijuana cigarettes and a handkerchief filled with pieces of chopped tobacco leaves, identified as marijuana  because the search of their person and the car was warrantless and not incident to a valid arrest.
The issues presented are (a) whether the Fourth Amendment right is applicable to a juvenile, and (b) if the answer is in the affirmative, is the motion to suppress rule, R.R. 3:2A-6, the proper method of implementing that right.
No authority has been cited by counsel nor has research disclosed any officially reported precedent dealing precisely with these issues in this State.
The State did not oppose the procedural aspect of the juvenile's motion to suppress, and it agreed with the court (also with the express consent of counsel for both adult defendants) to hear the entire matter in camera to insure privacy for the juvenile, R.R. 6:9-1, and to avoid hearing any portion of a juvenile matter in a courtroom regularly used for adult criminal cases, R.R. 6:2-6.

I
The Fourth Amendment to the United States Constitution provides:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
*313 This constitutional mandate is a fundamental right of all persons regardless of age. Urbasek v. People, 76 Ill. App.2d 375, 222 N.E.2d 233, 238 (App. Ct. 1966). The reason some basic constitutional rights, such as indictment by grand jury, right to speedy and public trial and right to trial by jury, were not applied with respect to juveniles was on the basis that the juvenile court was established as a civil court under a guardianship philosophy, the theory being that the interests of society and the minor would best be served by a solicitous attitude in the juvenile's care and training. The State assumes the position as parens patriae, and under its protective and rehabilitative ideals informal and confidential procedures developed, vouchsafing constitutional safeguards only when required by the concept of due process and fair treatment  not by direct application of the constitutional clauses. Pee v. United States, 107 U.S. App. D.C. 47, 274 F.2d 556 (D.C. Ct. App. 1959). It is noteworthy that the Pee decision referred to rights guaranteed by the Fifth, Sixth and Eighth Amendments, constitutional protections afforded persons involved in criminal prosecutions, thereby necessitating their application to a juvenile proceeding (noncriminal in nature) through the concept of due process. But the Fourth Amendment, not limited to persons accused of crime, should be interpreted to be applicable to all persons in accord with its terms, thereby rendering the media of due process unnecessary in granting that right to a juvenile.
Even adopting the view that a juvenile will realize constitutional rights only if required under due process of law and fair treatment, it appears that the evolution of the Fourth Amendment right leads to the same result.
The beginning concepts of illegal search and seizure were dealt with in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), wherein the court stated:
"It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; * * * it is the invasion of his indefeasible right of personal security, personal liberty, and private property * * *." (at p. 630, 6 S.Ct., at p. 532, emphasis added)
*314 Less than 30 years later the exclusionary rule was born in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), applicable only to the federal courts, wherein the court stated that the protection of the Fourth Amendment "reaches all alike, whether accused of crime or not * * *." Weeks (at p. 392, 34 S.Ct., at p. 344). The rule subsequently became applicable to the states through the due process clause of the Fourteenth Amendment. Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).
"The security of one's privacy against arbitrary intrusion by the police  which is at the core of the Fourth Amendment  is basic to a free society. It is therefore implicit in `the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause." (at p. 27, 69 S.Ct., at p. 1361)
To the extent Wolf refused to extend the Fourth Amendment right to state prosecutions wherein the evidence was illegally obtained by state officials, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), overruled it, applying the whole of the Fourth Amendment to the States through the Due Process Clause.
"Today we once again examine Wolf's constitutional documentation of the right to privacy free from unreasonable state intrusion, and * * * are led by it to close the only courtroom door remaining open to evidence secured by official lawlessness in flagrant abuse of that basic right, reserved to all persons as a specific guarantee against that very same unlawful conduct. We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." (at pp. 654-655, 81 S.Ct., at p. 1691, emphasis added)
The historical development clearly indicates that the rule is not only a basic right of all persons to privacy, security and liberty, whether accused of a crime or not, but is fundamental to the concept of due process, a principle precluding adjudications based on methods that offend a sense of *315 justice and one that must endure if our society is to remain free. To insure a fact-finding process which at least measures up to the essentials of fair treatment, State v. Carlo, 48 N.J. 224, 236 (1966), the constitutional safeguard enunciated in the Fourth Amendment must be applicable to juveniles.
The exclusionary rule of Mapp has become recognized as emphasizing a philosophy of governmental deterrence  a protection against official abuses  absenting from the limelight the basic right, itself. Such emphasis yields to theories espoused by some authorities that a juvenile hearing is only concerned with seeking the truth, and evidence, whether obtained lawfully or not, must be admissible for the avowed purpose of rehabilitating the youthful offender. The exclusionary rule, however, is the "correlative duty" of the government to the "constitutional right" of the individual to be secure from unreasonable searches and seizures. It is the essential ingredient of the constitutional guarantee of the right of privacy, providing a remedy for a preexisting constitutional right, State v. Johnson, 43 N.J. 572, 589 (1965), and it would best serve understanding to state that the exclusionary rule is a "deterrent safeguard," indicating it is more than a discouragement to improper police procedure; it is the force safeguarding the true substance of the rule  the individual's right as embodied in the Fourth Amendment.
This constitutional provision perpetuates principles of humanity and liberty implanted in our mores and institutions. It is a basic right given to all persons which should not be undermined by the rehabilitative philosophy adopted by our Legislature and courts. Praiseworthy as that philosophy may be, the court is sensitive to the historical development of this constitutional mandate and the present trend toward granting a juvenile more of his basic freedoms, ever alert to prevent infringement of constitutional rights so bound up in order and society by well-meaning efforts of the Legislature and judiciary. Good intentions are not enough to deprive a juvenile of due process. Application of Gault, 99 Ariz. 181, 189, 407 P.2d 760, 766 (Sup. Ct. 1965), probable jurisdiction *316 noted 384 U.S. 997, 86 S.Ct. 1922, 16 L.Ed.2d 1013 (1966), Kansas Association of Probate and Juvenile Judges granted leave to join appellee's brief, 385 U.S. 965, 87 S.Ct. 498, 17 L.Ed.2d 431 (1966).[*]
It appears more reasonable that the Juvenile Court Act was promulgated, not to deprive a juvenile of his rights but to ameliorate the harshness of the criminal law. True, all the niceties of the evidentiary rules and technicalities of procedure may be relaxed in ascertaining the "truth" in a juvenile hearing, yet substantial rights cannot be so disregarded. As stated in In Re Contreras, 109 Cal. App.2d 787, 241 P.2d 631 (D. Ct. App. 1952):
"* * * it cannot seriously be contended that the constitutional guarantee of due process of law does not extend to minors as well as to adults." (109 Cal. App.2d, at p. 791, 241 P.2d, at p. 634)
Is it not more outrageous for the police to treat children more harshly than adult offenders, especially when such is violative of due process and fair treatment? Can a court countenance a system where, as here, an adult may suppress evidence with the usual effect of having the charges dropped for lack of proof, and on the other hand, a juvenile can be institutionalized  lose the most sacred possession a human being has, his freedom  for "rehabilitative" purposes because the Fourth Amendment right is unavailable to him?
The constitutional right of privacy should be applicable to the young and old alike. This is especially true when the juvenile is accused of an act which, as here, is equivalent to criminal conduct had it been committed by an adult.[1]
*317 "After much reflection I am persuaded that `the requirements of due process and fair treatment' demand that the constitutional guarantee against unreasonable searches and seizures be extended to children charged with the doing of an act which if done by an adult would be a crime * * *." In Re Williams, 49 Misc.2d 154, 169, 267 N.Y.S.2d 91, 109 (Family Ct. 1966).[2]
Difficulty arises by not differentiating procedures adequate with respect to acts of juvenile delinquency noncriminal in nature, such as truancy or incorrigibility, from procedures dealing with conduct that would be criminal had it been committed by an adult. The court is limiting its decision to the specific factual pattern presented, namely, that the juvenile is 17 years of age and has committed an act that is indictable and would be characterized as criminal had he been an adult or had he requested a presentment to the grand jury R.R. 6:9-6; N.J.S. 2A:4-15. The problem not presently passed upon, i.e., what rights, procedures and rules are applicable to children of more tender years who have engaged in "noncriminal" behavioral patterns, invites further research, analysis, discussion and promulgation of legislation and court rules which would redefine rights of a juvenile and outline a procedure whereby they could be protected. This is especially propitious in light of the present Proposed Revision of the Rules Governing the Courts of the State of New Jersey (1966). In accord with the concurring opinion of Chief Justice Weintraub, State v. Carlo, supra, a method must be designed to uphold the rehabilitative objectives of the Juvenile Court system and, at the same time and in certain well-defined cases, preserve the constitutional rights of the juvenile without placing him on the same plane as an adult offender in all respects.
*318 A final justification in granting the Fourth Amendment right to a juvenile is not so much founded in constitutional or legal principles, but, ironically, rests in the parens patriae philosophy, that in order to better rehabilitate the juvenile, official misbehavior must not go undeterred; for development toward responsible adult citizenship depends on behavioral patterns set for the young, especially by those displaying governmental authority.
"Our Government is the potent, the omni-present teacher. For good or for ill, it teaches the whole people by its example. * * * If the government becomes a lawbreaker, it breeds contempt for law." Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Justice Brandeis dissenting)
More specifically, as regards the juvenile and the rehabilitative process.[3] The rehabilitative goal of the Juvenile Court is to instill respect for law and order. Such a goal is best realized if the police are required to deal fairly and legally with juveniles.
Although the Juvenile Court Act is intended to be salutary, and every effort should be made to further its purposes, it should not be made an instrument denying to a juvenile constitutional guarantees afforded to all persons, whether accused of crime or not. Our State and Federal Constitutions cannot be nullified by mere nomenclature, the end and substance being the same.
As the Appellate Court of Illinois indicated, the protection against unlawful search and seizure is a fundamental *319 right and should be available to the juvenile, especially when viewed in the spirit of the "laudable purposes of Juvenile Courts." Urbasek v. People, supra, 222 N.E.2d, at p. 238.
This court, therefore, charged with the support of our Constitution and ever watchful of its fundamental guarantees afforded to all persons, holds that the right of privacy, security and liberty against unreasonable searches and seizures is applicable to a juvenile in accordance with reason and due process of law.

II
The next issue presented is the manner in which the juvenile can implement his Fourth Amendment right. By order of the assignment judge of the Superior Court of Essex County, this court has been empowered to sit as a Juvenile Court, if necessary; but to do so would, in effect, allow it to create rules of procedure which are nonexistent in the Juvenile and Domestic Relations Court, a function which is the sole responsibility of the Supreme Court, N.J. Const., Art. VI, Sec. II, ¶ 3 (1947).
Further, it is the opinion of this court that a rule presently exists, namely, R.R. 3:2A-6, which would enable the juvenile, as it does an adult, to move to suppress evidence illegally seized. The pertinent part of the rule, indicating its applicability to this situation, provides:
"* * * a person claiming to be aggrieved by an unlawful search and seizure, and having reasonable grounds to believe that the evidence obtained may be used against him in a penal proceeding, may apply only to the Superior Court or County Court for the county in which the evidence was obtained for the return of property seized and to suppress the evidence obtained, even though the offense charged or to be charged may be within the jurisdiction of a municipal court." (Emphasis added)
The rule clearly applies to the extent that a juvenile is a person, and to the extent that any person claiming to be aggrieved may apply only to the Superior or County Court where the evidence was seized. The difficulty arises from *320 R.R. 3:1-1 governing the scope of the criminal practice rules, of which R.R. 3:2A-6 is a part, wherein it is stated that the criminal rules of procedure are broadly applicable except in Juvenile and Domestic Relations Court. This implies that a minor within the jurisdiction of the Juvenile Court may not utilize any of the rules of criminal procedure, at the hearing or prehearing stage. Initially, it is noted that the suppression rule, adopted in December 1962, became effective January 2, 1963, more than 14 years after R.R. 3:1-1 was adopted, indicating that R.R. 3:1-1 does not strictly limit the subsequent rule. See State v. Swiderski, 94 N.J. Super. 14, 19 (App. Div. 1967). In support of that thesis and more controlling is the fact that R.R. 3:2A-6 is broader in scope and goes beyond the language of R.R. 3:1-1. The latter rule limits the criminal practice rules to "criminal proceedings," whereas the suppression rule applies to a person who believes the evidence will be used against him in a "penal proceeding." "Penal" is inherently a much broader term than "criminal," since it pertains to any punishment or penalty and relates to acts which are not necessarily delineated as criminal. Marter v. Repp, 80 N.J.L. 530 (Sup. Ct. 1910), affirmed 82 N.J.L. 531 (E. & A. 1911); Silberman v. Skouras Theatres Corp., 11 N.J. Misc. 907 (C.P. 1933). A juvenile between the ages of 16 and 18 years (Juvenile B is 17 years old) is subject to incarceration, N.J.S. 2A:4-37, and nothing can be more penal in nature than denying a person his freedom, even if such confinement is for rehabilitation.
On this basis, it appears that R.R. 3:2A-6 is broad enough to permit a juvenile to enforce his constitutional right, but for the language in the rule stating that even if the offense is within the jurisdiction of the municipal court, the motion must be brought in the Superior Court or County Court. This might imply that if evidence seized is the basis of an offense within the jurisdiction of any other court, the rule becomes unavailable to the movant.
Such procedure was adopted to avoid having the municipal magistrate, who issues search warrants in cases generally of *321 the type likely to be within the jurisdiction of the County or Superior Court, hear the matter. It was also felt in the early stages of the law of search and seizure that for purposes of uniformity of decision it would be preferable to have only the Superior and County Court hear the motions to suppress. Proceedings of the Fourteenth Annual Judicial Conference (May 1962) (Report of the Supreme Court's Committee on Criminal Procedure, Morning Session, pages 5-6).
Most important is that the drafters of R.R. 3:2A-6, being in a different social context, did not consider the problem presently raised. Therefore, their expression of "municipal court" in the suppression rule should not be read as the expression of one court to the exclusion of another, but rather involves all courts dealing with penal behavior, indicating their intent that the Superior or County Court shall hear all motions to suppress no matter from which jurisdiction the offense arose.
Further, the recent trend of granting juveniles more constitutional safeguards, thereby necessitating utilization of the criminal rules of procedure by juveniles, has been recognized by the Committee on Revision of Rules of Criminal Procedure, for it has modified the scope of the criminal rules in an attempt to conform the practice and procedure of the Juvenile and Domestic Relations Court as closely as possible to the practice in the Superior and County Court. Proposed Revision of the Rules Governing the Courts of the State of New Jersey  Part III, "Rules Governing Criminal Practice," Proposed Rule 3:1-1 and comments, p. 185 (1966). If adopted, this would enable a juvenile to avail himself of the criminal rules of procedure unless otherwise expressly provided for in Part V (Juvenile and Domestic Relations Court rules).
Varying problems still exist, springing from the already entrenched differences between juvenile and adult procedures, such as R.R. 3:2A-6 requiring a hearing in open court whereas the juvenile must be given a confidential hearing, and a possible dichotomy of what constitutes probable cause, there being a lesser standard indicated for juveniles under *322 R.R. 6:8-3(a). Neither problem need be passed upon at this time since all the motions were heard in chambers (consented to by all the parties), and the determination of the substance of the motion, infra, avoids the necessity of differentiating degrees of probable cause.
Based on the foregoing the court holds that as with any person claiming to be aggrieved by an unlawful search and seizure a juvenile, charged with an act of juvenile delinquency that would otherwise be a high misdemeanor, misdemeanor or other offense, or violation of a penal law or municipal ordinance, or an offense which could be prosecuted in a method partaking of the nature of a criminal proceeding, or being a disorderly person, may move to suppress evidence pursuant to R.R. 3:2A-6.[4] See State v. Swiderski, supra.

III
The final issue to be resolved in this case is whether the evidence  marijuana cigarettes, a handkerchief filled with chopped up greenish-brown leaves, and a box of paper used for rolling cigarettes  was seized as the result of an unlawful search.
The following testimony was adduced at the hearing of the motion. Two Newark police officers, Donald A. Janowski and Alfred Pepe, both in uniform, while patrolling in a marked police car on the evening of January 3, 1967, observed a new Mustang automobile with three occupants parked on the right-hand side of 6th Avenue, facing east, near Ridge Street, in the City of Newark. This is an open and deserted location with Branch Brook Park on one side, a church on *323 the other side, and no residences. Both officers testified that this area is known as "Lovers Lane" and is also a known area where stolen cars are "dropped." They became suspicious and decided to investigate. Officer Pepe drove the patrol car to the rear but parallel to the Mustang, and both officers exited from their car. Patrolman Janowski approached the Mustang automobile from the passenger's side and Patrolman Pepe from the driver's side. Before reaching the other car, Patrolman Janowski stated that the passenger's door opened revealing a figure of a man about to exit with something in his hand, which he could not identify. The patrolman told him to stop and the man closed the door and resumed his position in the car. Upon reaching the right-hand side of the car, Officer Janowski observed, through a closed window, the passenger in the front seat, Benjamin Ferguson, attempt to hide cigarettes, first under his legs, then under his seat. Still looking through the window, Officer Janowski saw two or three cigarettes on the floor in front of Ferguson, a couple of cigarettes on Ferguson's lap, and a handkerchief with what looked like small pieces of tobacco lying open on the console. When Ferguson rolled down the window at his request the officer detected the sweet smell of marijuana, an odor with which he was familiar from previous investigations and arrests. The passenger in the right rear seat, Juvenile B, informed the patrolman that he was 16 years old, whereupon he was asked to leave the car. To permit this the upper portion of the front seat and defendant Ferguson had to move forward, causing several more cigarettes in the front of the car to be exposed to the view of Officer Janowski. The police officer then testified that he removed the cigarettes, at which time he did not recall if anyone was still in the car. He stated that he used a flashlight but did not recall whether he flashed it through the window or inserted part of his body in the car to look around. According to Patrolman Janowski, the arrests were made a few moments later.
Patrolman Pepe corroborated the testimony of his partner for the most part. He stated that he arrived at the driver's *324 side of the car at the same time his partner reached the other side, and he observed, through the window, Ferguson's attempt to hide something under his person and then under his seat. When the window was rolled down, upon his request for the driver's license and registration, he too smelled the sweet aroma of marijuana. Officer Pepe further testified that he observed through the window three or four rolled cigarettes, crimped at the ends "like marijuana is usually rolled"; and at that point he placed the occupants under arrest. When the driver, Alan Lowry, was placed up against the car, Officer Pepe stated he saw on the console an open handkerchief containing chopped up leaves of brownish-green color and a box filled with paper to roll cigarettes. The entire car was then searched, revealing nothing more.
Only Benjamin Ferguson testified for the defense. He stated someone yelled "cops" and the next moment Patrolman Janowski was right alongside of him shining a flashlight in his face. He denied ever trying to leave the car and stated that Officer Janowski opened the car door, told Juvenile B and himself to get out, and searched them both, taking from his person a fingernail file, keys, matches and Winston cigarettes. He stated that the officer put the cigarettes on the front seat and then took them out, apparently, although it was not made clear, as if he just found them. Defendant stated nothing was on the console and that both patrolmen searched the entire car. He said Patrolman Pepe took the handkerchief and box of cigarette rolling paper from the car but he could not see where the patrolman got it from.
Defense counsel contend that the arrest or apprehension of these individuals was based not on probable cause, but at most, on suspicion, which would not justify the search and seizure without a warrant. No moment of arrest was pinpointed except by counsel for defendant Lowry, who contended that when Officer Janowski saw defendant Ferguson try to leave the car and yelled "Stop," such constituted an arrest at which time no probable cause existed.
*325 Defense counsel most accurately state the law regarding warrantless searches, but they overlook the very nature of the factual circumstances leading to the seizure of the evidence, which clearly indicates no search was involved at all.
The testimony adduced was uncontradicted that there were three males sitting in a new Mustang automobile in a deserted area known to the police officers as a drop area for stolen cars, as Lovers Lane, and an area known for criminal activity. It cannot seriously be contended that these officers had no right to investigate this situation and even request the driver's license and registration. R.S. 39:3-29.
"A law enforcement officer has the right to stop and question a person found in circumstances suggestive of the possibility of violation of criminal law. [citations omitted] Such investigatory detention is not an arrest, `[a]nd the evidence needed to make the inquiry is not of the same degree or conclusiveness as that required for an arrest.'" State v. Hope, 85 N.J. Super. 551, 554 (App. Div. 1964)
Not only did the police officers have a right to investigate under the aforementioned circumstances, but they had a duty to investigate, State v. Smith, 37 N.J. 481, 496 (1962); State v. Taylor, 81 N.J. Super. 296, 313 (App. Div. 1963); and in the proper exercise of their responsibility these officers observed through the car windows the crimped cigarettes on the floor of the car and on the lap of defendant Ferguson. Officer Janowski also observed through the window from the passenger's side the handkerchief lying open on the console with the chopped up leaves inside of it. (This was not observed by Officer Pepe until Lowry got out of the car, at which time he also saw a box containing paper to roll cigarettes.) Defendant's story, uncorroborated by the other passenger or by the driver, that there was no handkerchief on the console is totally unbelievable.
In the absence of any physical entry into the automobile there is no unreasonable search, for in fact there was no search. Observing this evidence, fully disclosed and in plain view of the police officers, whether or not in artificial light, is not a search. State v. Griffin, 84 N.J. Super. 508, *326 517 (App. Div. 1964); State v. Murphy, 85 N.J. Super. 391, 397 (App. Div. 1964), affirmed 45 N.J. 36 (1965). A search implies some exploratory investigation and a prying into hidden places for that which is concealed. State v. Griffin, supra, 84 N.J. Super., at p. 517; People v. Elmore, 28 Ill.2d 263, 265, 192 N.E.2d 219, 220 (Sup. Ct. 1963). No such prying or investigating into hidden and concealed places was revealed at this hearing. This was observation of objects in open view to Officers Janowski and Pepe, who were conscientiously performing their duty.
Briefly passing on defendants' contention that no probable cause existed, this court finds that the common and work-a-day knowledge of these police officers, their familiarity with the nature of this area, their observation of a new car parked there with three male occupants, coupled with their proper detention and investigation of the suspicious occupants, all of which led to direct perception without a search of incriminating objects within the car, constituted probable cause, and a search of the vehicle without a warrant was proper. State v. Taylor, supra, 81 N.J. Super., at p. 313.
If defense counsel's argument is interpreted to mean that no probable cause existed prior to the observations, it lacks merit, for such was, as indicated above, proper and responsible police procedure. Such is the answer to counsel for Lowry, who contended that Officer Janowski's order to defendant Ferguson to "stop" constituted an arrest. Not only was it proper police detention and investigation, but defendant Ferguson denied ever trying to leave the car; and further, even if it were considered such a restraint of liberty as to constitute an arrest, nothing flowed therefrom  the evidence would have been discovered notwithstanding the alleged arrest.
Defendants' motion for suppression is denied. Submit appropriate order providing, among other things, that the matter before the Juvenile Court proceed in its normal course.
NOTES
[*] Decided May 15, 1967, after the handing down of this opinion. 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527.
[1] "When the jurisdiction of a court is being invoked for a criminal offense, basic constitutional rights should be available to all  adults or juveniles. When the charge is the commission of a crime, rights should be identical, be the accused 16 or 60. * * * Gardner, `The Kent Case and The Juvenile Court: A Challenge to Lawyers,' 52 A.B.A.J. 923, 924 (1966)" State v. Carlo, supra, 48 N.J., at p. 235, footnote 2.
[2] New York has somewhat stronger procedural safeguards for the juvenile as indicated by specific provisions of their Family Court Act, § 711 (purpose to provide due process of law in juvenile proceedings): § 735 (statement given during preliminary conference inadmissible at fact-finding hearing); § 741(a) (advised of right to remain silent, which has been interpreted to be the equivalent of the privilege against self-incrimination, [Committee Comments] and Williams, supra, at p. 168, 267 N.Y.S.2d 91).
[3] This view was also adopted by Chief Justice Weintraub, concurring in State v. Carlo, supra, wherein he stated:

"If the State would rehabilitate a youngster, its officers of course should set the good example. The police should not use tactics which are palpably wrong." 48 N.J., at p. 245.
And see In Re Ronny, 40 Misc.2d 194, 242 N.Y.S.2d 844 (Family Ct. 1963):
"I can think of few worse examples to set for our children than to visit upon children what would be, if they were older, unreasonable and unconstitutional invasions of their all-too-limited privacy and rights, merely because they are young." 40 Misc.2d, at p. 210, 242 N.Y.S.2d, at p. 860
[4] Having concluded that the juvenile is entitled to his Fourth Amendment right, it might appear that the court is "reaching" to utilize R.R. 3:2A-6 as the implementation of that right; but since no other logical remedy is available, the court is willing to so "reach." Even if there were no remedy of this kind, on the principle of fundamental fairness the court would devise a procedure. Such, however, is not necessary in light of R.R. 3:2A-6. See R.R. 1:27A ("Relaxation of Rules").