395 F.Supp. 1052 (1975)
UNITED STATES of America
v.
Hipólito Cruz PAGÁN et al.
Cr. No. 411-72.
United States District Court, D. Puerto Rico.
March 17, 1975.
*1053 *1054 José A. Quilés, Asst. U. S. Atty., San Juan, P.R., for plaintiff.
Gino Negretti, Miami, Fla., Joaquín Monserrate Matienzo, Hato Rey, P.R., Roberto De Jesús Cintrón, Río Piedras, P.R., for defendants.

OPINION AND ORDER
PESQUERA, District Judge.
Upon defendants' motion for suppression of evidence, the Court held an evidentiary hearing that lasted several weeks. At the conclusion of the hearing, the Court granted the parties sufficient time to file memoranda.
Defendants' motion for suppression of evidence seeks to suppress three different searches and seizures made by U.S. Customs agents from December 5, 1972 to December 8, 1972.
Defendants' first request is to suppress all evidence obtained as a result of a search conducted on Apartment 311, Girasol Condominium, owned by defendant Hipólito Cruz Pagán, and all evidence seized from a Chevrolet Impala bearing Puerto Rican license plate #98N987, property of National Car Rental, leased by the same defendant.
Said searches were made pursuant to a search warrant issued by the United States Magistrate on December 5, 1972. The search of the car took place on December 5, 1972 and that of the apartment on December 6, 1972. Defendants argue that the search warrant was issued without probable cause.
Next, defendants ask us to suppress approximately 1,500 pounds of marihuana seized from a panel delivery van driven by defendant Hipólito Cruz Pagán while accompanied by codefendant Guillermo Rafael Bordenave on December 5, 1972. As to this search, defendants raise the question that the said search was unreasonable without a search or arrest warrant to support it.
Thirdly, defendants ask us to suppress all evidence obtained as a result of a search of Apartment 2-D located on 11 Cervantes Street, leased by codefendant Rafael Guillermo Bordenave. This search was conducted pursuant to a written consent obtained from the occupants of the apartment at the time the search took place. Defendants argue with respect to this latter search, that it was without a warrant and in violation of defendants' constitutional rights.
The Court will consider each of defendants' claims and arguments separately.
Defendants' position in connection with the search of the automobile and Apartment 311, Girasol Condominium, is that the Magistrate's Search Warrant is invalid and not based on probable cause. They argue that the affidavit in support of the search warrant is insufficient on its face because it does not contain sufficient information to reasonably link the automobile and the apartment with the defendants and the commission of an offense.
It has been held that ". . . affidavits for search warrants . . . must be tested and interpreted by magistrates and the courts in a commonsense and realistic fashion. They are normally drafted by non-lawyers in the midst of haste of criminal investigation. Technical requirements of elaborate specificity once exacted under the common law "pleadings have no proper place in this area. A grudging or negative *1055 attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting". U. S. v. Ventresca, 380 U.S. 102-108, 85 S. Ct. 741, 746, 13 L.Ed.2d 684 (1965).[1] Moreover, it has been held that an affidavit though based on hearsay is sufficient "so long as a substantial basis for crediting the hearsay is presented".[2]
The facts in the affidavit for search warrant tending to establish the ground for the warrant are the following:
"On November 12, 1972, information received from a reliable informant stated that Hipólito Cruz Pagán and Rafael G. Bordenave Morales were involved in the smuggling of narcotics. On November 29, 1972 additional information stated that Cruz Pagán and Bordenave were in South America. On December 5, 1972 at about 2:00 a. m. aircraft HK 1487P landed without authority at Yauco, Puerto Rico and police officers of Yauco observed a car which was on the runway speeding away, abandoning the aircraft, as they approached the airport. On December 5, 1972 a search of the area near the aircraft disclosed white paint residues where the car had collided and a license for a car bearing license plate 98N987, property of National Car Rental. On December 5, 1972 a check conducted at National Car Rental disclosed the car to be rented to Hipólito Cruz Pagán, that it was a white Chevrolet Impala, which car had not been returned to the rental company".
In the instant case, in addition to the affidavit submitted, the Magistrate opened court and conducted a probable cause hearing for the issuance of the search warrant.[3] This hearing was directed at determining the reliability of the informer.
Upon being questioned by the Magistrate, agent Octavio Piñol expressed that the informant had given reliable information in the past. The informer had been working with him for about two and a half years. The informer had given information in other cases under investigation concerning narcotics. That he always found the informer reliable and that the information provided by him was never found to be false or in error. Thereupon, the Magistrate made a finding that the informer was reliable. However, the identity of the informer was not disclosed for reasons that appear on the record of the proceedings.
Defendants, in attacking the affidavit, use the dissecting method and go over the affidavit sentence by sentence in order to make the point that the affidavit is insufficient. Such method is incorrect as it appears abundantly clear from the decisions cited in footnote one of this order.
Defendants place a heavy stress on the decisions of Spinelli v. U. S., 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).[4] In *1056 the case at bar, the Court finds that the facts are distinguishable from those present in Spinelli and Aguilar.
The facts proffered in the affidavit, taken in conjunction with the hearing on probable cause to determine the informer's reliability, are sufficient in law to establish a probable cause connection between the illegal activities of Hipólito Cruz Pagán, his apartment and the rented automobile. Here, the information provided by the informer on two occasions disclosed that Cruz Pagán and Rafael Guillermo Bordenave were involved in smuggling narcotics, and that five days before the issuance of the warrant, the informer told agent Piñol that both defendants were in South America.
Here, unlike Spinelli and Aguilar, the Magistrate made an independent determination that the informer was reliable after conducting his inquiry. Thus, the hearing supports the conclusion of the agent that the informer is reliable. Deference should be given to the Magistrate as he is the one who has direct observation of affiant's demeanor while offering his testimony.
The courts have to date approved two distinct type of statements sufficient to indicate that an informer is reliable. The first is the general conclusory statement which must be more informative than the statements rejected in Aguilar and Spinelli.[5] The second is where the underlying circumstances by which the informer has acquired his information are described in sufficient detail to conclude that the information itself is reliable and not based on rumor or mere suspicion. However, if either of the two tests indicated above are not met, probable cause may still be established if the affidavit itself recites corroborating evidence which buttresses the informer's *1057 reliability and/or the reliability of his information.
In the present case, there is not only the separate determination by the Magistrate that the informer is reliable, but additionally there is independent evidence to corroborate the information provided by the informer.
The facts established in the affidavit (supra at page 3) indicate that an aircraft of foreign registration (Colombian) had landed in a dirt airstrip seldom in use, and that when the police approached the aircraft, a car was observed speeding away from the site of the plane. A search of the area yielded a car license #98N987 which upon further investigation, proved to have been leased by Hipólito Cruz Pagán and that the car had not been returned to the leasing company. The aircraft was left abandoned by persons who fled from the scene when the police arrived. These facts known to the agents, coupled with the informer's tip that the defendants were in South America presumably on a trip to obtain narcotics, established reasonable basis for the search warrant.
Irrespective of the finding of probable casue for the issuance of the search warrant, the Court will now consider the question of consent for the search. The relevant facts as they appear from the evidence, are as follows. On December 5, 1972 at approximately 7:00 p. m., Hipólito Cruz Pagán, while accompanied by Guillermo Rafael Bordenave, was arrested driving a panel delivery van that contained approximately 1,500 pounds of marihuana. Immediately upon arrest, Cruz Pagán was advised of his constitutional rights by Customs Special Agent Calderón; thereafter, the defendant was again advised of his rights on at least two more occasions. The defendant Cruz Pagán requested and was permitted to use a phone. Shortly thereafter, counsel came to his aid. The defendant was permitted to confer in private with his counsel. After the interview, and with counsel still present, agent Rivera Rodríguez advised Cruz Pagán that he had a search warrant for his apartment and requested from him the keys to the same. The defendant turned over his keys. The following day a number of Customs agents, using the keys furnished by the defendant, opened the apartment and conducted the search that yielded small amounts of cocaine, marihuana and numerous weapons plus sophisticated communication equipment.
On this point, the Court finds the government's argument most persuasive.[6] From the evidence, it appears that the defendant was treated well and was neither coerced or intimidated in any manner in obtaining the keys to his apartment. Thus, from the totality of the circumstances surrounding the arrest and the request for the keys, the Court now makes a finding that Hipólito Cruz Pagán made an effective and voluntary consent to the search of his apartment.[7]
*1058 We turn next to the question of whether the warrantless search of the panel delivery van from which approximately 1,500 pounds of marihuana were seized, was unreasonable under the circumstances.
On this point the position of the defendants is that the arrest of Hipólito Cruz Pagán and Guillermo Rafael Bordenave and the search of the van that they were utilizing was not based on probable cause and without arrest or search warrant. Defendants further advance the argument that even assuming there was probable cause for the arrest of defendants Cruz Pagán and Guillermo Bordenave, the Customs agents did not have authority to search the van.
The pertinent facts leading up to the arrest of the defendants and the search of the van from where the seizure was made, are as follows:
In the early hours of December 5, 1972, the police of Puerto Rico and some civilians discovered an abandoned aircraft at the Santa Rita Airstrip, Yauco, Puerto Rico. When the police approached the aircraft, they observed a vehicle speeding away from the scene. This aircraft had a Colombian Registration #HK87P. The discovery was immediately reported to federal authorities who proceeded to send agents to the site. On the spot investigation disclosed that near the aircraft some twenty-five plastic jugs were found empty but still with the smell of gasoline.[8] The information was relayed to Customs agents in San Juan, who continued the investigation and discovered that the previous evening approximately 100 gallons of aviation gasoline had been sold by one Awilda Reyes at the Isla Grande Airport in San Juan. The individuals to whom the gasoline was sold were described[9] and said to be driving a new white panel delivery van bearing dealer exhibition plates. This information was transmitted by radio to agent Piñol who by this time was enroute to El Girasol Condominium to ascertain the number of the apartment belonging to Hipólito Cruz Pagán. Agent Rivera requested of agent Piñol that he inspect the area of the condominium for the panel delivery van. At approximately 3:00 p. m., December 5, 1972, agent Piñol reported that he had verified the apartment number and that he had observed a white panel delivery van fitting the description of the one he had received parked in the underground parking lot of the Girasol Condominium.
At approximately 4:30 p. m. that afternoon, a search warrant for Apartment 311, Girasol Condominium and for the automobile, was obtained. According to the testimony received at the hearing, no warrant was obtained for the van found in the underground parking lot because agent Piñol at that time had no other indication that the van had been involved in nothing more than the transportation of the gasoline.
At 5:30 p. m., December 5, 1972, a number of Customs agents proceeded to Apartment 311, Girasol Condominium to execute the daytime search warrant previously obtained. Upon knocking at the door of the apartment, they failed to receive a response. Then the question arose as to whether or not the warrant should be executed at that time since it was already getting dark. It was decided that agent Marcano would contact one of the Assistant U.S. Attorneys for his opinion. While this was being done, agents Rivera Calderón and Piñol decided to go and inspect the panel delivery van reported to be stationed at the underground parking lot of the condominium. Upon reaching the underground parking, they observed the van parked immediately to the right side of the exit door from where they entered the area. As they *1059 approached the van, they could detect a strong odor of marihuana emanating from the vehicle.[10] They also noticed that the glass window in the rear of the panel had been covered with masking tape and in the interior of the van there was a partition between the driver's seat and the cargo area. In this fashion the cargo area was blocked to all outside view. Because of the heavy odor of marihuana emanating from the van, the agents decided to report the new discovery to the Assistant U.S. Attorney who agent Marcano had gone out to contact. The matter was reported and the instructions from the Assistant U.S. Attorney were to maintain surveillance on the van until the search warrant could be amended, but if the van was moved, to act according to the circumstances. The conversation with the Assistant U. S. Attorney took place around 6:50 p. m. Thereafter, the agents positioned themselves in and around the area of the Girasol Condominium on locations where they could observe if the van left the parking lot. While on this surveillance, agent Piñol observed defendant Rafael Guillermo Bordenave in the vicinity and proceeded to ask him if he knew him.[11] Upon receiving a negative reply, the matter was dropped. A minute or so after this incident, the agents observed the van exiting the underground parking area. Agent Rivera identified Cruz Pagán as the driver and Guillermo Rafael as his companion. As the van came out to the street it travelled around 200 feet before making a right turn into the parking area of Condominium Villas del Mar Este, which is next to the Girasol. The van was followed bumper to bumper by agent Calderón and Customs patrol officer Bonilla, who were driving an official vehicle. Once inside the parking area of Condominium Villas del Mar Este, the defendants proceeded to drive the vehicle at fast speed without obeying a stop sign and came to stop in front of an elevator module located near the end of the parking area. As soon as the defendants stopped the van, and as agent Calderón and Customs patrol officer Bonilla were placing defendant under arrest, other agents began to arrive. Agent Rivera then took charge and proceeded to instruct agent Calderón to move his vehicle out of the way since it was blocking traffic and a number of civilians were beginning to gather in the area. Agent Rivera testified that he wanted to clear the area for safety purposes. He also wanted to move the van so he requested the keys from defendant Cruz Pagán. Prior to moving this van, agent Rivera proceeded to open the side door of the cargo area. According to his testimony in Court, he wanted to search the van and as he stated, ". . . I was aware of more persons involved; we had two persons under arrest, I could not see into the inside of the truck, I was going to move this truck to the United States Customs House and I wanted to see if there was anybody in there".[12] The agent opened the door, gun in hand, but did not find anyone inside, instead he saw 18 cardboard cases of the type used to pack cigarette cartons. Inspection of these boxes revealed them to be packed solid with a green vegetable substance. A field test was performed on the spot and it gave positive for marihuana.[13]
At about the same time the arrest of Cruz Pagán and Guillermo Rafael Bordenave was taking place. Agent Piñol was informed by radio that Rafael Guillermo Bordenave was at the office of the National Car Rental located at the San Juan International Airport returning *1060 the Chevrolet Impala that had been leased by Cruz Pagán. His arrest was ordered by agent Piñol. Once under custody all three defendants were taken to the U.S. Customs House for processing before being taken to the Magistrate.
Defendants challenge the ability of the agents to detect the odor of marihuana that emanated from the van. On this point, it has been held that the expertise of a police officer in narcotics may be an important factor in assessing the probable cause to seize items in an automobile.[14] The evidence on record establishes that agents Calderón, Rivera and Piñol are all officers of vast experience on the subject of marihuana and other narcotics. Agent Piñol had worked for the U.S. Customs Service for twenty-six years and is now working as Special Agent for the Drug Enforcement Administration. Agent Rivera has worked as a Special Agent for Customs for six years and agent Calderón for two years.[15] The agents testified at length during the hearing as to their experience relating to the recognition of the odor of marihuana. This Court is persuaded that the agents are fully capable of recognizing the odor of marihuana.[16] Moreover, in this case we are dealing with a substantial amount of marihuana enclosed in the limited cargo area of the van. Probable cause for arrest on the basis of odor of narcotics has been found in the following cases.
Hernández v. U. S., 353 F.2d 624, Cert. Den. 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021; U. S. v. Fischer, 38 F.2d 830 (1930); U. S. v. Troise, 483 F.2d 615 (1973); U. S. v. Martínez Miramontes, 494 F.2d 808 (9th Cir. 1974); U. S. v. Odgen, (9th Cir.) 485 F.2d 536.
The case of Martínez Miramontes, supra,[17] this Court finds is very persuasive on the point of the extension of the "plain view" doctrine to the use of other senses to establish probable cause. No longer is an officer restricted *1061 to seizing evidence that is in "plain view". Now the doctrine has been expanded to cover that evidence that can be perceived by the sense of smell or what the officer may hear. In United States v. Bowman, (10th Cir.) 487 F.2d 1229, the Court held that "a border patrol agent who had learned how to identify marijuana by sight or by its odor has probable cause to search and seize and to effect arrests upon discovery of the marijuana in the vehicle".
Defendants' emphasis in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924) and Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1931), in support of their theory that an odor alone does not authorize a search without a warrant, is misplaced. A careful analysis of these cases convinces us that they are distinguishable from the case at bar. In Carroll, the Supreme Court held that a police officer without a warrant may search a vehicle stopped by him on the highway, provided that the search is based on probable cause that the vehicle contains contraband. The Supreme Court then went on to distinguish between the search of a dwelling structure for which a warrant may be readily obtained and the search of a vehicle which can be moved quickly from the jurisdiction before a warrant is obtained. Thus, Carroll rather than supporting defendants' argument, defeats it.
In Taylor, the Supreme Court held that suspicion that a person is engaged in violation of the prohibition laws confirmed by the odor of whiskey and by peeping through a chink in the garage adjacent to his dwelling and part of the same premises did not justify prohibition officers in breaking into the garage for the purposes of obtaining evidence of guilt. As it can be readily ascertained, the facts in Taylor are entirely different from those in this case for in Taylor the place of the search was a garage next to a dwelling structure and not a moving van such as in this case.
Defendants further point out that even assuming probable cause to arrest them, the agents did not have a right to search the van without a warrant. The fallacy of defendants' argument lies in the fact that they mistake the probable cause to arrest the defendants with the probable cause necessary to search the van.
As the term probable cause implies, and as it has been defined, it is nothing more than facts and circumstances such as to warrant a man of prudence and caution in believing that an offense has been or is being committed. Applying this principle to the case at bar, the Court finds that the agents had probable cause to search the van. The information known to the agents at the time of the search was sufficient to satisfy the requirement of probable cause. The facts show that after obtaining the search warrant, the agents had gone to Apartment 311 of the Girasol Condominium to execute the same. By this time, they were also aware that a van fitting the description of the one seen the previous evening when a purchase of 100 gallons of aviation gasoline was made, was stationed in the underground garage of the condominium. They went and examined the van closely and detected a heavy odor of marihuana emanating from it. They reported their finding to an Assistant U.S. Attorney who instructed that a surveillance be maintained on the van. Within minutes after the surveillance was initiated, two of the defendants are observed driving out of the parking lot onto the highway and then immediately turning into the parking lot of Condominium Villas del Mar Este. The defendants are arrested when they attempt to abandon the van near an elevator module. Moreover, the agents were aware that defendant Cruz Pagán was connected to the aircraft that had been left abandoned in the wee hour of the morning since they had traced to him the car license found at the site.
Thus, from all these facts it appears that the agents not only had probable *1062 cause for the arrest of the defendants, but to search the van as well.
In their brief defendants have called into question the applicability of the doctrine of Chimel v. California, 395 U. S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1962), which limits the area of the search to the area under the immediate control of the defendant at the moment of arrest. The reliance in Chimel is misplaced. As a practical matter, courts have long recognized that following an arrest a police officer must have some power to conduct an immediate search in order to remove weapons from the reach of the suspect and/or prevent him from destroying evidence of a crime. Agnello v. U. S., 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925); U. S. v. Rabinowitz, 339 U.S. 56, 72, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Harris v. U. S., 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).
In recent years this rule has been extended to things within the immediate control of the suspect and depending on the circumstances of the case and the place of arrest. Preston v. U. S., 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Agnello, supra.
This general principle has been said to apply to a suspect automobile, thus an automobile may be searched incident to an arrest if the arrest takes place in or near the vehicle. There is no doubt that a vehicle may be searched incident to an arrest if the defendant is inside the car or beside it "as the place of arrest", or in his immediate control. U. S. v. Doyle, 373 F.2d 875 (2nd Cir. 1967) (search found reasonable where the car was in defendant's immediate presence but a few feet away from him when he was handcuffed and taken into custody). See also U. S. v. Simpson, 353 F.2d 530 (2nd Cir. 1965); Ford v. U. S., 122 U.S.App.D.C. 259, 352 F.2d 927 (1965); Adams v. U. S., 118 U.S.App. D.C. 364, 336 F.2d 752 (1964), Cert. denied, 379 U.S. 977, 85 S.Ct. 676, 13 L. Ed.2d 567; U. S. v. Low, 257 F.Supp. 606 (D.C.Pa.1966); U. S. v. Kapatos, 255 F.Supp. 332 (D.C.N.Y.1966).
When employed in this context the term "control" is rather loosely defined, it is not intended to mean that the car must be under the actual physical control of the arrestee. It is sufficient for the application of the doctrine that the suspect has enjoyed free access to the place of arrest, thereby raising the probability that physical evidence may be found there. See, e. g. Hass v. U. S., 344 F.2d 56, 60 (1965).
In several cases these doctrines have been expanded to uphold a search of a vehicle or premises located some distance away from the point of the arrest, if the arrest and the search were part of one continuous transaction. Clifton v. U. S., (4th Cir.) 224 F.2d 239, Cert. denied, 350 U.S. 894, 76 S.Ct. 152, 100 L. Ed. 786; U. S. v. Jackson, 149 F.Supp. 939, 941 (D.C.D.C.1957); Rhodes v. U. S., 224 F.2d 348 (C.A.Fla.1955).
Closely related to movable vehicle cases are those in which the suspect is on the move and the police are in hot pursuit. Here too the exigencies of the circumstances make a search without a warrant imperative. See Warden Maryland Penitentiary v. Hayden, 387 U.S. 294, 299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). There is evidence in this case which would justify the search due to the exigencies of the situation. From the testimony of agents Rivera and Calderón, it appears that as soon as the van emerged from the underground parking, officer Calderón and Customs patrol officer Bonilla started the chase by car while other agents ran after the van as it entered the parking area of the adjacent condominium. After the arrest, agent Rivera was aware that another defendant, Rafael Guillermo Bordenave, had been seen in the area minutes before and his absence was unaccounted, thus he decided to look inside the cargo area of the van trying to clear the possibility that someone might be hiding there, thus posing a threat to his life. See Chambers v. Maroney, 399 U. S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). In sum, we hold that the search *1063 of the van was reasonable and lawful. The result is consistent with the decision of U. S. v. Barron, 9th Cir., 472 F. 2d 1215, Cert. denied, 413 U.S. 920, 93 S.Ct. 3063, 37 L.Ed.2d 1041 (1973); U. S. v. Campos, (9th Cir.) 471 F.2d 296; Fernández v. U. S., (9th Cir.) 321 F.2d 283; U. S. v. Anderson, (10th Cir.) 468 F.2d 1280 and U. S. v. Miller, (10th Cir.) 460 F.2d 582.[18]
We now consider the issue of whether or not the search of Apartment 2-D, 11 Cervantes Street, Condado, Santurce, was illegal and in violation of defendant Rafael Guillermo Bordenave's constitutional rights.
The relevant facts leading up to this search are as follows.
On December 8, 1973, a telephone call was received by agent Piñol from one Antonio Durand who informed that Mr. and Mrs. Rafael Guillermo Bordenave[19] had leased from him Apartment 2-D located at 11 Cervantes Street. As a result of the call, agents Rivera and Piñol proceeded to said address to further interview Mr. Durand. He reiterated that he had leased the Apartment 2-D to Mr. and Mrs. Rafael Guillermo Bordenave and that on that day a man who identified himself as Mr. Rafael Guillermo Bordenave had requested permission to enter the apartment.
Subsequent to the interview, the agents knocked at the door of Apartment 2-D and were met by two young ladies. After the agents identified themselves they requested permission to search the apartment after Miranda's warning had been given by the agents. Both ladies agreed to permit the agents to search the apartment. The agents before searching decided to seek advice from an Assistant U.S. Attorney. They were advised to proceed provided written consent was obtained. One of the two ladies identified herself as Miss Lorraine Ferranti who said she lived in the company of Rafael Guillermo Bordenave. Both ladies signed written consent and the apartment was searched.
Here we are concerned with a consent obtained from a person other than the defendant. In search of this nature, the government bears a heavy burden of proving consent was voluntary and it must do so with clear and convincing evidence. Only if it has met this test can the evidence obtained as a result of a warrantless search be introduced. In Stoner v. California, 376 U.S. 483 (1964), the Supreme Court emphasized that what is important to bear in mind was the petitioner's constitutional right and not the night clerk, nor the hotel. It was therefore only the petitioner who could waive by word or by deed either directly or indirectly or through an agent. Here the facts show that defendant Rafael Guillermo Bordenave had been in custody since December 5, 1972, yet no attempt was made to secure his consent.
The agents merely relied on the consent of Miss Ferranti and another female occupant. The uncontroverted evidence presented at the hearing established that Miss Ferranti was not the wife of the defendant but merely a friend who was staying at the apartment for a few days as a guest of the defendant while she found another place to live. Under such circumstances, the weight of authority stands firmly against consent by such person. Although the agents acted in good faith when they obtained the consent and searched the apartment, we find that Miss Ferranti or her other guest had neither actual or implied authority to act as agent for the defendant and consent to the search. Accordingly, the evidence found in Apartment *1064 2-D, 11 Cervantes Street, Condado, Santurce, is hereby suppressed.
For the above stated reasons, we hold as follows on defendants' motion for suppression of evidence. As to the evidence seized at Apartment 311, Girasol Condominium and the Chevrolet Impala leasing license #98N987, the motion is denied; as to the evidence seized from the panel delivery van, the motion is also denied, as to the evidence seized from Apartment 2-D, 11 Cervantes Street, Santurce, the motion is granted and the evidence is ordered suppressed. This order is made applicable to Cr. case No. 54-73, United States of America v. Félix Capestani Lugo. Trial of this case (Cr. 411-72) and Cr. case 54-73 (United States of America v. Félix Capestani Lugo) is hereby set for May 19, 1975 at 9:00 a. m.; and a hearing to consider pending requests for severance and/or consolidation, is hereby set for March 31, 1975 at 9:00 a. m.
NOTES
[1] See also U. S. v. Conti, 361 F.2d 153 (2nd Cir.) (1966) Vacated on other grounds, 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968); U. S. ex rel. Gary v. Follete, 418 F.2d 609 (2nd Cir.) (1969). Pendergrast v. U. S., 135 U.S.App.D.C. 20, 416 F.2d 776, 784 (1969).
[2] Jones v. U. S., 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); U. S. v. Pascente, 387 F.2d 923 (7th Cir.) (1967). Cert. denied, 390 U.S. 1005, 88 S.Ct. 1248, 20 L.Ed.2d 105 (1968); U. S. ex rel. Schnitzler v. Follete, 406 F.2d 319 (2nd Cir.) (1969) Cert. denied, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 244 (1969).
[3] This hearing has been transcribed and is now part of the records of this case.
[4] In Spinelli, the Court reiterated that the Aguilar test is two pronged. First, the affidavit must set forth the facts which are sufficient to indicate the reliability of the informant; second, the underlying circumstances by which the informant acquired his information must be described in sufficient detail to permit the Magistrate to conclude that the information itself is reliable and not based upon rumor and suspicion. If either test is not met, probable cause may still be established if the affidavit recites corroborative evidence which buttresses (a) the informant's reliability and/or (b) the reliability of the information.

In Aguilar, a warrant was requested for the search of the defendant's home for narcotics. The supporting affidavit merely stated that the officers had received reliable information from a credible person that led them to believe that narcotics and narcotic paraphernalia were being kept at the defendant's premises. The court announced the two pronged tests outlined above and held that this affidavit failed to meet the test because no attempt was made to support the claim that the informant was reliable and because none of the underlying circumstances were set forth so that the Magistrate could independently judge the validity of the informant's conclusions as to the presence of narcotics.
In Spinelli, the affidavit of the officer indicated that over a period of five days they had observed the defendant making four trips by car from Illinois to Saint Louis, Missouri. After each trip, he was seen leaving his automobile in an apartment house parking lot and entering the building. One of the days he was followed further and seen entering a certain apartment. The apartment was found to contain two telephones with different numbers, both listed in the name of a person other than Spinelli. The agents swore that they had been informed "by a confidential reliable informant" that Spinelli was operating a bookmaking operation using the mentioned telephone numbers. Finally, the application stated that Spinelli was known to the law enforcement people as a gambler and an associate of gamblers. The affidavit was held to be inadequate because the reference to the informant failed to give any reason for the conclusion as to his reliability, and because the tip off did not contain a statement of underlying circumstances sufficient to justify the inference that Spinelli was a gambler. His comings and goings and the presence of two telephones were held to be innocent activities. Moreover, the reference to his gambling reputation was said to be a "bold and unilluminating assertion of suspicion" entitled to weight in determining the existence of probable cause. The tips were held not to describe any criminal conduct in sufficient detail to assure the Magistrate that the informant was relying on nothing more substantial than rumor or suspicion.
[5] An example of this type of statement is that involved in the First Circuit case of U. S. v. Vigo, 413 F.2d 691 (5th Cir.) (1969). Vide also U. S. v. Bridges, 419 F.2d 963 (8th Cir.) (1969). There, the affidavit stated that the affiant's information came from an informer who had proven reliable in the past on several occasions on his utilization as an informer for the Federal Bureau of Narcotics (Vigo at 692). The Court held the factual statement of "past reliability" provided sufficient basis to the Magistrate to gauge informer's reliability.
[6] The government relies on U. S. v. Jones, 475 F.2d 723 (5th C.A.) (1973), where the 5th Circuit refused to invalidate consent given after defendant was under arrest. Consent was found to be voluntary though the defendant had just been awakened, surrounded by FBI agents, handcuffed and arrested. The Court noted he had been given Miranda's warnings and was not coerced or intimidated by the agents. The Appellate Court held that a finding of voluntary consent should not be disturbed on appeal unless it appears that the consent was physically and mentally coerced by the action of the arresting officer creating more than normal duress inherent in any arrest.
[7] See, U. S. v. Miner, 484 F.2d 1075 (9th Cir. 1973); U. S. v. Luton, 486 F.2d 1021 (5th Cir. 1973); Potts v. State, 500 S.W.2d 523 (Tex.Cr.App.1973). Here, while defendant was under arrest for violation of a vagrancy statute, subsequently declared, in part, unconstitutional, he consented to a search of his premises. It was held that the mere fact that the defendant was under arrest did not prevent free and "voluntary" consent to the search from being given. The Court went on to state "furthermore even assuming that the arrest and detention were illegal such voluntary consent would have disrupted the illegality of the arrest".
[8] At the airstrip in Yauco the officers also found some aeronautical charts, landing lights and a car registration for a Chevrolet Impala bearing license # 98N987.
[9] The two individuals driving the panel delivery van are now identified as defendants George Murphy Cunningham and Félix Capestani Lugo, who is charged in Cr. 54-73 for the same facts.
[10] Agent Rivera's testimony, Transcript at page 342.
[11] The record reflects that agent Piñol wanted to know if Rafael Guillermo Bordenave had recognized him since he had on another occasion arrested the defendant for another offense relating to marihuana.
[12] Agent Rivera's testimony, Transcript proceedings at page 348.
[13] The marihuana found inside the van weighed around 1,462 Lbs.
[14] Corrao v. State, Ind.App., 290 N.E.2d 484; Oberlin v. State, 9 Md.App. 426, 265 A.2d 275; State v. Lowry, 95 N.J.Super. 307, 230 A.2d 907.
[15] Agent Calderón is a retired Lt. Col. from the United States Army who served with the Special Force. He testified he had been exposed to marihuana in Panama, Vietnam, in addition to receiving training on the subject of narcotics.
[16] The thorough cross-examination conducted by attorneys for the defendants convinces this Court that the agents can recognize the odor of marihuana. The fact that they individually upon discovery of the van reported the finding to an Assistant U. S. Attorney lends complete corroboration to their testimony in Court.
[17] Court stated:

"Appellant argues that the act of the customs officer in sniffing around the crevice where the trunk closes constituted a search proscribed by the Fourth Amendment. We do not agree. We find no distinction of substance between leaning down and turning the head to look inside a motor vehicle to see articles which then come within the `plain view' doctrine, see, e. g., U. S. v. Belperio, 452 F.2d 389 (9th Cir. 1971), and leaning down and sniffing to detect the odor of marihuana.
"The appellant relinquished his reasonable expectation of privacy in the trunk of his automobile when he loaded it with 442 pounds of an odorous weed. By the use of ordinary senses while standing in a place where the officer had a right to be standing, he could then detect the nature of the load. We held in United States v. Fisch, 474 F.2d 1071 (9th Cir.), cert. denied, 412 U.S. 921 [93 S.Ct. 2742, 37 L.Ed.2d 148] (1973), that defendants who had discussed their criminal activities in a motel room in voices so audible as to be heard in the adjoining motel room did not retain a Katz `reasonable expectation of privacy' in their conversation. Further, no Fourth Amendment intrusion occurred when law enforcement officers listened more closely by placing themselves on the floor next to the crack beneath the door separating the two rooms. We refused to make `hair-splitting' constitutional distinctions between the two situations and likewise find no distinction in the use of the olfactory organs whether the revealing odor is detected in a stroll around the car or by a sniff over the trunk compartment. See also U. S. v. Capps, 435 F.2d 637, 641-643 n. 7 (9th Cir. 1970); Ponce v. Craven, 409 F.2d 621, 625 (9th Cir. 1969), cert. denied, 397 U.S. 1012 [90 S.Ct. 1241, 25 L.Ed.2d 424] (1970)."
[18] This line of cases establish that smell alone is sufficient to constitute probable cause for a subsequent search of marihuana.
[19] This defendant had been in custody since December 5, 1973 when he was arrested at the National Car Rental Agency, while delivering the Chevrolet Impala license # 98N987 at the request of defendant Hipólito Cruz Pagán.